# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

XIAOXING XI, *et al.*,

                Plaintiffs,

      v.

FBI SPECIAL AGENT ANDREW
HAUGEN, *et al.*,

                Defendants.

Civil Action No. 17-2132

---

**DEFENDANT SPECIAL AGENT ANDREW HAUGEN'S MOTION TO DISMISS PLAINTIFF'S CONSTITUTIONAL CLAIMS AGAINST HIM IN PLAINTIFF'S SECOND AMENDED COMPLAINT**

Under Federal Rule of Civil Procedure 12(b)(6), FBI Special Agent Andrew Haugen moves to dismiss the constitutional claims brought against him by Plaintiff Xiaoxing Xi because those claims fail to state a claim upon which relief may be granted. The grounds for this motion are set forth in the accompanying memorandum in support of this motion. A proposed order is attached.[1]

---

[1] Xi and two family members also bring tort claims against the United States. The United States has filed a separate motion to dismiss addressing those claims.

Dated: January 23, 2018                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General
                                           Civil Division

                                           C. SALVATORE D'ALESSIO, Jr.
                                           Acting Director, Torts Branch

                                           RICHARD MONTAGUE
                                           Senior Trial Counsel

                                               /s/  *Paul E. Werner*
                                           PAUL E. WERNER
                                           (MD Bar, under LCvR 83.5(e))
                                           Trial Attorney
                                           United States Department of Justice
                                           Torts Branch, Civil Division
                                           P.O. Box 7146
                                           Washington, D.C.  20044
                                           (202) 616-4152 (phone)
                                           (202) 616-4314 (fax)
                                           E-mail: Paul.Werner@usdoj.gov

                                           Attorneys for Special Agent Haugen

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

XIAOXING XI, *et al.*,

               Plaintiffs,

     v.

FBI SPECIAL AGENT ANDREW
HAUGEN, *et al.*,

               Defendants.

Civil Action No. 17-2132

---

**MEMORANDUM IN SUPPORT OF SPECIAL AGENT ANDREW HAUGEN'S
MOTION TO DISMISS PLAINTIFF'S CONSTITUTIONAL CLAIMS AGAINST HIM
<u>IN PLAINTIFF'S SECOND AMENDED COMPLAINT</u>**

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, Jr.
Acting Director, Torts Branch

RICHARD MONTAGUE
Senior Trial Counsel

PAUL E. WERNER
(MD Bar, under LCvR 83.5(e))
Trial Attorney
United States Department of Justice
Torts Branch, Civil Division
P.O. Box 7146
Washington, D.C.  20044
(202) 616-4152 (phone)
(202) 616-4314 (fax)
E-mail: Paul.Werner@usdoj.gov

Attorneys for Special Agent Haugen

## INTRODUCTION

In an increasingly technological world, the protection of sensitive technologies developed domestically is important to the national security of this country. Illegal and surreptitious transfers of sensitive technologies to foreign powers and entities, through espionage or otherwise, undermine the United States' efforts and successes in remaining the global leader in advanced technologies. The FBI is one of the law enforcement and intelligence agencies tasked with preventing and investigating such transfers.

Plaintiff Xiaoxing Xi brings this lawsuit against FBI Special Agent Andrew Haugen based on the investigation and prosecution of Xi for allegedly attempting to unlawfully transfer protected superconducting film technology to entities in China. Xi, who seeks damages from Special Agent Haugen personally, claims that Special Agent Haugen targeted him simply because Xi was from China.

In this context, and under recent Supreme Court and Third Circuit precedent, Xi's claims must fail. Xi asks this Court to create a damages remedy in a context that could have national security and foreign policy implications for the United States. Moreover, litigation of Xi's claims, based on his own allegations, would involve classified information that could not be disclosed in open court. Under controlling case law, this Court should not accept Xi's invitation.

## BACKGROUND[2]

Xi is a physics professor at Temple University who is a leading expert in the field of magnesium diboride thin film superconducting technology. Second Am. Compl. ("SAC") ¶¶ 1, 25. According to his amended complaint, Xi communicated with individuals and entities in

---

[2] For the purposes of this motion to dismiss only, the Court may assume the veracity of the well-pled factual allegations in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

China regarding certain technologies. *Id.* ¶ 3. He alleges that Special Agent Haugen unlawfully surveilled Xi's communications, both under § 702 of the Foreign Intelligence Surveillance Act, 50 U.S.C. § 1881a ("FISA"), by searching law enforcement databases in which he "examined, retained, and/or used" Xi's communications, and under "FISA orders." SAC ¶¶ 60, 64-65, 128-30. Xi avers that Special Agent Haugen improperly concluded that Xi was sharing with entities in China protected information concerning a superconducting thin film technology developed by a United States company and that Xi had leased. *Id.* ¶¶ 30-31. Xi's lease agreement with the company prohibited Xi from reproducing, selling, transferring, or otherwise distributing the technology. *Id.* Effectively, according to the complaint, Special Agent Haugen accused Xi of "being a technological spy for China." *Id.* ¶ 1. A grand jury indicted Xi on four counts of wire fraud, and he was arrested at his house, which was searched pursuant to a warrant, and was questioned by the FBI. *Id.* ¶¶ 24, 32-40.

After his indictment, Xi hired defense counsel, who made a presentation to the United States Attorney's Office, explaining purported errors in the indictment. *Id.* ¶ 52. According to Xi, his communications with individuals and entities in China did not violate his lease agreement; involved different technologies, including technologies he himself invented; and were within the normal course of academic collaboration. *Id.* ¶¶ 3-4, 48-51. The United States Attorney's Office later dismissed the indictment. *Id.* ¶ 52.

Xi alleges, in various forms, that Special Agent Haugen, who was working on counterintelligence with a focus on China, *id.* ¶ 69, "knowingly and/or recklessly made or caused to be made false statements and representations" in his reports to federal prosecutors, *id.* ¶ 54; "knew or recklessly disregarded the fact" that Xi did not violate his lease agreement with the United States technology company, *id.* ¶ 3; and "had no scientific or other basis to allege" that

Xi's communications with entities in China were "illegal or involved the illegal transmission of protected technologies." *Id.* ¶ 56. The second amended complaint asserts that Special Agent Haugen lacked probable cause to surveil Xi's communications and to indict and arrest Xi. *Id.* ¶¶ 59, 99, 103. Instead, Xi claims, Special Agent Haugen targeted him because of his Chinese ethnicity. *Id.* ¶¶ 68-70. He points to two other recent, unrelated indictments of Chinese Americans that were later dismissed as support for his contention. *Id.*

## PROCEDURAL HISTORY

Xi first filed a complaint naming Special Agent Haugen as the sole defendant, and alleging five claims against him under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Four counts were for alleged violations of Xi's Fourth Amendment rights in the course of (1) the prosecution of Xi; (2) the purported surveillance of Xi pursuant to "FISA orders"; (3) the alleged warrantless surveillance of Xi pursuant to § 702 of FISA; and (4) the search of Xi and his belongings following his arrest. One count was for alleged violation of Xi's equal protection and due process rights under the Fifth Amendment in the course of Xi's indictment and prosecution. *See* Doc. No. 1, Compl. ¶¶ 72-82. Xi also sought an injunction "requiring" Special Agent Haugen to return or destroy all information obtained from Xi's electronic communications and devices that is in his custody or control. *Id.* at 20.

Xi then amended his complaint, adding six claims against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(l), 2671-2680 (2012) (FTCA), and adding his wife and daughter as plaintiffs on the FTCA claims only. *See* Doc. No. 6-1, Am. Compl.  Special Agent Haugen and the United States each filed dispositive motions to dismiss the respective claims against them. *See* Doc. No. 15, United States' Mot. to Dismiss; Doc. No. 16; Special Agent Haugen's Mot. to Dismiss.

Plaintiffs then amended their complaint a second time, dropping the Fourth Amendment claims against Special Agent Haugen for the alleged surveillance of Xi under "FISA orders" and the purported warrantless surveillance of Xi under § 702 of FISA, and adding three defendants in their official capacities as the defendants on Xi's request for an injunction requiring the Government to expunge any of his electronic communications it has in its possession. *See generally* SAC. Three claims against Special Agent Haugen remain. Count I is for alleged violations of Xi's Fourth and Fifth Amendment rights in the course of the prosecution of Xi. Count II is for alleged violation of Xi's equal protection and due process rights under the Fifth Amendment in the course of Xi's indictment and prosecution. And Count III is for alleged violations of Xi's Fourth Amendment rights during the search of his house, belongings, and computers. Xi seeks compensatory and punitive damages. SAC at 34.

Xi also altered his characterization of Special Agent Haugen's state of mind during the investigation. *Compare* Doc. No. 6-1., Am. Compl., ¶¶ 3-4, 48, 50, 52 (alleging that Special Agent Haugen "knew or should have known" that Xi's actions were lawful), *with* SAC ¶¶ 3-4, 53, 55, 57 (alleging that Special Agent Haugen "knew or recklessly disregarded" that Xi's actions were lawful). Additionally, Xi altered his characterization of the basis for Special Agent Haugen's understanding of the information he gleaned during the investigation. *Compare* Doc. No. 6-1., Am. Compl., ¶ 51 (alleging that Special Agent Haugen "did not have a basic understanding of the science involved" in thin film research, and that he "failed to consult with qualified scientists"), *with* SAC ¶ 56 (alleging that Special Agent Haugen "had no scientific or other basis to allege" that Xi's communications with entities in China were illegal).

Special Agent Haugen now moves to dismiss the three claims against him under Federal Rule of Civil Procedure 12(b)(6).

## STANDARD OF REVIEW

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "considers the allegations of the complaint and documents referenced therein in the light most favorable to the plaintiff." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 357 (3d Cir. 2014) (citing and quoting *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *N.Y. Shipping Ass'n Inc. v. Waterfront Comm'n of N.Y. Harbor*, 835 F.3d 344, 352 (3d Cir. 2016) (internal citation omitted) (quoting *Iqbal*, 556 U.S. at 678).

When applying that standard, the court ignores non-factual content, such as "labels and conclusions," or a "formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal citation omitted). The court then assumes the truth of well-pled factual allegations and determines whether those factual allegations lift the assertion of misconduct across the line from "sheer possibility" to "plausibility." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). Although the "plausibility standard is not akin to a 'probability requirement,'" *id.*, an inference of misconduct may be rendered implausible when the allegations of misconduct are more likely explained by lawful behavior than by unlawful behavior. *See id.* at 679-80; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007).

## ARGUMENT

This Court should dismiss Xi's claims against Special Agent Haugen because, as the Supreme Court and the Third Circuit recently explained, Xi asks this Court to extend *Bivens* into

a new context where multiple "special factors counseling hesitation"—including the effect of this litigation on national security and foreign relations—are present. Moreover, Special Agent Haugen is entitled to qualified immunity because probable cause existed to indict Xi; in effect, Xi alleges Special Agent Haugen was negligent in his investigation; in any event, no clearly established Fourth Amendment violation occurred; and Xi has failed to allege facts stating an equal protection or due process claim.

## I.    Special Factors Counseling Hesitation Preclude Xi's Claims.

Xi's complaint that he was unlawfully targeted as an alleged spy for China and that he was subjected to FISA surveillance clearly asks this Court to extend *Bivens* into a new context and raises multiple special factors counselling hesitation. This Court should dismiss his complaint in its entirety on that basis alone.

### A.  Inferring a new *Bivens* remedy is disfavored.

#### i.    The "*ancien regime*" and *Abbasi*.

Plaintiff asks this Court to create a damages remedy for him under *Bivens*, an action that "is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). In *Abbasi*, the Supreme Court explained that *Bivens*, which was decided over forty-five years ago, arose in a different legal "interpretive framework" under which courts "assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose." *Id.* at 1855 (internal quotations and citations omitted). Under this "*ancien regime*," the *Bivens* Court "held that courts must adjust their remedies so as to grant the necessary relief when federally protected rights have been invaded." *Id.* (internal quotations and citations omitted). *Bivens* itself provided a damages remedy under the Fourth Amendment for a United States citizen arrested without a warrant in his home in Brooklyn on drug charges. *See Bivens*, 403 U.S.

at 389. In the decade after *Bivens*, and still under the then-prevailing legal framework, the Court

expanded *Bivens* into only two new contexts: "a claim against a Congressman for firing his

female secretary; and a claim against prison officials for failure to treat an inmate's asthma."

*Abbasi*, 137 S. Ct. at 1860 (reciting facts in *Davis v. Passman*, 442 U.S. 228 (1979), and *Carlson

v. Green*, 446 U.S. 14 (1980)).

　　　　But in the more than three decades since *Carlson*, the legal landscape has shifted away

from implied causes of action, and the Court has "consistently refused to extend *Bivens* to any

new context or new category of defendants." *Abbasi*, 137 S. Ct. at 1857 (citing and quoting *Corr.

Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001)). *See also Vanderklok v. United States*, 868 F.3d

189, 198 (3d Cir. 2017) ("[O]ver the course of nearly four decades, the Supreme Court has

repeatedly refused to recognize *Bivens* actions in any new contexts." (citation omitted)). Indeed,

in the nine cases that came before the Court in that time period—ten including *Abbasi*—the

Court held that a *Bivens* remedy was not available. *See, e.g.*, *Abbasi*, 137 S. Ct. at 1863 (rejecting

claims by post-September 11 detainees against Executive Branch officials); *Minneci v. Pollard*,

565 U.S. 118, 120 (2012) (rejecting claims by federal prisoner against guards at private prison);

*Wilkie v. Robbins*, 551 U.S. 537, 547-48 (2007) (rejecting claims against Bureau of Land

Management officials for allegedly pushing "too hard" in the execution of their duties); *Malesko*,

534 U.S. at 63 (rejecting claim against private prison operator); *FDIC v. Meyer*, 510 U.S. 471,

473-74 (1994) (rejecting claim against federal agency). The Court itself has gone so far as to

note that "in light of the changes to the Court's general approach to recognizing implied damages

remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been

different if they were decided today." *Abbasi*, 137 S. Ct. at 1856. Although the Court has not

abrogated *Bivens*, it has emphasized—repeatedly—that "expanding the *Bivens* remedy is now a

'disfavored' judicial activity." *Id.* at 1857 (quoting *Iqbal*, 556 U.S. at 675). *See also Vanderklok*, 868 F.3d at 200 (citing and quoting *Abbasi*).

Accordingly, the Court explained that when a party "seeks to assert an implied cause of action under the Constitution . . . separation-of-powers principles are or should be central to the analysis." *Abbasi*, 137 S. Ct. at 1857. "The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?" *Id.* (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). And because "[i]t is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others," *Abbasi*, 137 S. Ct. at 1858, the Court offered this answer: "most often it will be Congress." *Id.* at 1857. That is because when an issue "involves a host of considerations that must be weighed and appraised, it should be committed to those who write the laws rather than those who interpret them." *Id.* (quoting *Bush*, 462 U.S. at 380) (internal quotations omitted).

ii.     **The standard for implying a damages remedy.**

*Abbasi* also clarified the standard for evaluating whether to imply a damages remedy under *Bivens*. First, a court must determine whether recognizing a remedy would extend *Bivens* into a new context. The Court defined "new context" as an instance where "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court." *Id.* at 1859. In other words, if the case is different "in a meaningful way" from either Fourth Amendment claims against federal law enforcement officers for a domestic warrantless search and seizure of a United States citizen on suspected drug offenses, *see Bivens*, 403 U.S. at 389; Fifth Amendment claims for the firing of a female congressional secretary based on her gender, *see*

*Davis*, 442 U.S. at 230; or Eighth Amendment claims against prison officials for failing to treat an inmate's asthma, causing him death, *see Carlson*, 446 U.S. at 19, then the context is new.

The Court then offered a non-exhaustive list of examples that could "prove instructive" in determining whether differences are meaningful. *Abbasi*, 137 S. Ct. at 1860. That list included, among others, the following two examples: (1) "the risk of disruptive intrusion by the Judiciary into the functioning of other branches"; and (2) "the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* Each of these examples alone could render the context new. *Id.* Moreover, seemingly minor differences, if meaningful, can present a new context. As the Court in *Abbasi* noted, "even a modest extension is still an extension." *Id.* at 1864.

If a plaintiff seeks to extend *Bivens* into a new context, then the court *must* address whether special factors counsel hesitation. *See id.* at 1860. To answer this question, the Supreme Court has engaged in a two-step inquiry announced in *Wilkie*. The court first asks whether Congress has instituted "any alternative, existing process for protecting" a plaintiff's interests, 551 U.S. at 537, or any "meaningful safeguards or remedies" for the plaintiff. *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988). Such actions by Congress imply that it "expected the Judiciary to stay its *Bivens* hand" and not infer a new damages remedy. *Wilkie*, 551 U.S. at 554; *see, e.g.*, *Abbasi*, 137 S. Ct. at 1863 ("And when alternative methods of relief are available, a *Bivens* remedy usually is not."); *Chilicky*, 487 U.S. at 429; *Bush*, 462 U.S. at 390.  That Congress's scheme may not provide the precise remedy a plaintiff seeks, such as damages, does not alter this analysis. *See United States v. Stanley*, 483 U.S. 669, 683 (1987) ("[I]t is irrelevant to a 'special factors' analysis whether the laws currently on the books afford [defendants] an 'adequate' federal remedy for his injuries.").

9

Second, even if no alternative process amounts to a reason not to extend *Bivens*, the court considers whether there are any additional "special factors counselling hesitation." *Wilkie*, 551 U.S. at 550. Although the Court "has not defined" that phrase, the "necessary inference . . . is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1857-58. The threshold for being a special factor is quite low. Indeed, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.*

Although the *Abbasi* Court did not provide an exhaustive list of special factors counselling hesitation, it did provide a number of concrete examples. One such example is a claim that "of necessity" requires "an inquiry into sensitive issues of national security." *Id.* at 1861. As the Court explained, "[w]ere this inquiry to be allowed in a private suit for damages, the *Bivens* action would assume dimensions far greater than those in *Bivens* itself, or in either of its two follow-on cases." *Id.* The Third Circuit recently applied this guidance in dismissing on special factors grounds *Bivens* claims against federal officials because those claims arose in a context implicating national security. *See Vanderklok*, 868 F.3d at 207 ("[T]he reluctance of the Supreme Court to weigh in on issues of national security strongly suggests that we too should hesitate to create a remedy when those issues are in play." (citations omitted)).

A second example is where a plaintiff effectively challenges a broad government program or policy. *See Abbasi*, 137 S. Ct. at 1860 ("[I]t must be noted that a *Bivens* action is not a proper vehicle for altering an entity's policy." (internal citation and quotation omitted)).

Here, Xi undoubtedly asks this Court to extend *Bivens* into a new context. Moreover, both concrete examples of special factors mentioned above, as well as other special factors, are

10

present in his lawsuit. Accordingly, this Court should dismiss Xi's constitutional claims against Special Agent Haugen.

### B.  Xi asks this Court to infer a remedy in a new context.

Xi's constitutional claims clearly seek to extend *Bivens* into a new context, as the Supreme Court defined that phrase in *Abbasi*. None of the three cases extending a *Bivens* remedy—the seminal case, *Davis*, and *Carlson*—involved a context remotely similar to the one here: the investigation (which allegedly included both warrantless and court-ordered foreign intelligence surveillance), arrest, and prosecution of a scientist for allegedly spying on behalf of a foreign power by transferring to it sensitive United States technologies.

The differences between this context and that of the three Supreme Court cases mentioned above are certainly "meaningful." Indeed, as explained in more detail below, Xi's claims present "the risk of disruptive intrusion by the Judiciary into the functioning of other branches," *Abbasi*, 137 S. Ct. at 1860, namely, the FBI's ongoing counterespionage efforts to prosecute and prevent the transfer of sensitive United States technologies to foreign powers. Moreover, Xi's claims raise "potential special factors that previous *Bivens* cases" decided by the Supreme Court "did not consider." *Id.* Specifically, Xi's claims raise the likelihood that classified information would be relevant to his claims and to Special Agent Haugen's defense of those claims, a situation that the Supreme Court has never considered, but that multiple courts of appeals have held is a special factor counselling hesitation, as described below. Given that "the new-context inquiry is easily satisfied," *id.* at 1865, Xi's claims clearly ask this Court to extend *Bivens* into a new context. Accordingly, this Court must determine whether any special factors counsel hesitation in this new context.

**C.  Multiple special factors counsel hesitation in this new context.**

Not only does Xi seek to extend *Bivens* into a new context, but he seeks to extend it into a context rife with special factors identified by the Supreme Court and the Third Circuit, namely, national security concerns, among other special factors counselling hesitation. *See Abbasi*, 137 S. Ct. at 1861.

       **i.  Xi's claims implicate national security, a special factor that the Third Circuit recently recognized in dismissing a *Bivens* claim.**

As the *Abbasi* Court explained, "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers in trenching on matters committed to the other branches.'" *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 403, 417 (2002)). In light of that, "'courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs' unless 'Congress specifically has provided otherwise.'" *Abbasi*, 137 S. Ct. at 1861 (quoting *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988)). *See also Vanderklok*, 868 F.3d at 206 ("The Supreme Court has never implied a *Bivens* remedy in a case involving military, national security, or intelligence." (quoting *Doe v. Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012))). Indeed, the Third Circuit in *Vanderklok* recently dismissed First Amendment claims against a Transportation Security Administration (TSA) agent in part because TSA agents "are tasked with assisting in a critical aspect of national security." 868 F.3d at 207. As the Third Circuit stated, "national security policy is the prerogative of the Congress and the President, and imposing damages liability would likely interfere with that prerogative by causing an official to second-guess difficult but necessary decisions concerning national-security policy." *Id.* (quoting *Abbasi*, 137 S. Ct. at 1861).

Here, as in *Abbasi* and *Vanderklok*, Xi's claims beckon this Court to inquire "into the national-security realm." He challenges the alleged warrantless surveillance of foreign entities

and the prosecution of an individual—himself—allegedly accused of acting as a spy for a foreign power, SAC ¶¶ 1, 40, 75, 87, 111, through the transfer of sensitive technologies to that foreign power. Litigation of those allegations would clearly implicate national security concerns. Accordingly, under both Supreme Court and Third Circuit precedent, this Court should dismiss Xi's constitutional claims.

> ### ii.   Xi's claims also implicate foreign affairs, a special factor courts have recognized.

Similarly, Xi's claims raise foreign affairs concerns. Although the *Abbasi* Court did not specifically mention foreign affairs as a special factor, many of the separation-of-powers concerns underlying the reluctance of the Judiciary to intrude upon matters of national security apply with equal force to judicial intrusion upon matters of foreign affairs, given the Executive and Legislative Branches' constitutional prerogatives in that realm. Article II of the Constitution states that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties . . . [and] appoint Ambassadors," and also "shall receive Ambassadors and other public Ministers." *Id.* art. II, §§ 2-3. Article I gives Congress the power to "regulate Commerce with foreign Nations" and "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." *Id.* art. I, § 8. Given the textual commitment of foreign affairs to the political branches, "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981). *See also Vanderklok*, 868 F.3d at 206 (quoting *Haig v. Agee*). Indeed, matters that implicate national security often, if not always, implicate foreign affairs as well, given the inextricable interplay between those two national interests. *See United States v. Mechanic*, 809 F.2d 1111, 1114 n.1 (5th Cir. 1987) ("Preserving our national security inherently implicates the

conduct of foreign affairs."). This is certainly so in a case involving allegations that a United States citizen acted as "a technological spy for China." SAC ¶ 1.

Moreover, several circuits have recognized that foreign policy concerns are a special factor. *See Arar v. Ashcroft*, 585 F.3d 559, 575 (2d Cir. 2009) ("The Supreme Court has expressly counseled that matters touching upon foreign policy and national security fall within 'an area of executive action in which courts have long been *hesitant* to intrude' absent congressional authorization." (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993))); *Ali v. Rumsfeld*, 649 F.3d 762, 774 (D.C. Cir. 2011) ( "[T]he danger of foreign citizens' using the courts . . . to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist." (quoting *Sanchez-Espinoza*, 770 F.2d 202, 209 (D.C. Cir. 1985) (Scalia, J.))). *Cf. Vanderklok*, 868 F.3d at 206 ( "[N]ational security decisions, insofar as they relate to foreign relations and the military, have, to a large extent, been insulated from judicial review."). Xi, of course, is a United States citizen, and therefore the precise foreign affairs concerns detailed in *Ali* do not squarely arise in this case. Without question, however, litigating the allegations in this suit, which involves the investigation and prosecution of a United States citizen for allegedly spying for China, SAC ¶¶ 1, 40, 75, 87, 111, threatens to affect United States foreign policy.

In short, Xi's claims implicate both national security and foreign affairs. The Supreme Court and the Third Circuit have clearly held that the former is a special factor counselling hesitations. Other circuits have held that the latter is also a special factor. This Court should therefore dismiss Xi's suit against Special Agent Haugen.

### iii.    Xi's claims as alleged implicate classified information, the relevance of which three circuit courts have held counsels hesitation.

Even beyond the national security and foreign affairs implications discussed above, adjudication of Xi's assertion that Special Agent Haugen conducted surveillance of him under FISA without probable cause—assuming the truth of that assertion for the purposes of this motion—potentially raises the distinct and serious scenario of the relevance of classified information to both the claim itself and the defense of that claim. Multiple circuits have held that cases in which claims or defenses involve classified information present special factors.

Indeed, the Second, Fourth, and D.C. Circuits have all held that the need to review classified information to adjudicate a *Bivens* claim is a special factor counselling hesitation. *See Lebron v. Rumsfeld*, 670 F.3d 540, 554 (4th Cir. 2012) ("Cautioning against the implication of a *Bivens* cause of action here are practical concerns about obtaining information necessary for the judiciary to assess the challenged policies. Much of the information relevant . . . remains classified."); *Arar*, 585 F.3d at 577 ("The court's reliance on information that cannot be introduced into the public record is likely to be a common feature of any *Bivens* actions arising in [this] context . . . . This should provoke hesitation, given the strong preference in the Anglo-American legal tradition for open court proceedings . . . ."); *Wilson v. Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008) (dismissing *Bivens* suit in part because "[l]itigation of the Wilsons' allegations would inevitably require an inquiry into 'classified information that may undermine ongoing covert operations.'" (quoting *Tenet v. Doe*, 544 U.S. 1, 11 (2005))).

As the Second Circuit elaborated, adjudicating claims that involve classified information would lead to some information being "redacted, reviewed *in camera*, or otherwise concealed from the public." *Arar*, 585 F.3d at 577. Such limited access to information in the course of civil litigation runs the risk that "'an unexpected outcome can cause a reaction that the system at best

15

has failed and at worst had been corrupted.'" *Id.* (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 571 (1980)). The court added that although "the problems posed by the need to consider classified material are unavoidable in some criminal prosecutions" where Congress has obligated courts to exercise jurisdiction, a *Bivens* claim—where the plaintiff asks the court *to infer* a cause of action on its own—"is not such a circumstance or such a case." *Arar*, 585 F.3d at 577.

And the D.C. Circuit explained that the potential exposure of classified information could inadvertently eliminate fruitful sources of information: "As the Supreme Court has recognized, 'even a small chance that some court will order the disclosure of a source's identity could well impair intelligence gathering and cause sources to close up like a clam.'" *Wilson*, 535 F.3d at 710 (quoting *Tenet*, 544 U.S. at 11) (internal citation and alteration omitted). The court added: "We will not create a cause of action that provides that opportunity." *Id.* These observations are all the more compelling in light of the Supreme Court's recent admonitions that "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide," *Abbasi*, 137 S. Ct. at 1858, and demands consideration of "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." *Id.* The costs and consequences of creating a damages remedy in this context cannot be overstated. And in all events, they quite plainly warrant leaving the question to Congress. Because Xi's claims—assuming the truth of the underlying allegations—would invariably lead to litigation over classified information, they raise special factors counselling hesitation. This Court should dismiss those claims.

iv.     **Xi challenges Executive Branch programs and policies.**

Additionally, Xi's suit effectively challenges a government program. He challenges the FBI's alleged surveillance of foreign entities and its alleged use of information gleaned from its surveillance to prosecute—and thereby deter—the suspected transfer of sensitive United States technologies to foreign entities and countries. Xi even refers to at least one other dismissed prosecution involving the alleged unlawful transfer of sensitive information in attempting to buttress his complaint. *See* SAC ¶ 68.[3] Xi also includes in his complaint a lengthy discussion of the National Security Agency's alleged "extensive and concerted warrantless surveillance of Chinese universities and scientific research institutions." SAC ¶ 61.

Clearly, the United States has a strong interest in preventing the transfer of sensitive United States information and technologies to unauthorized entities and to foreign powers, and has instituted policies to promote that interest, including the prosecution of unlawful transfers, and the passage of a statute, FISA, which permits under appropriate circumstances the surveillance of foreign entities. Xi's claims "would call into question" the "implementation" of this purported "general policy." *Abbasi*, 137 S. Ct. at 1860. Furthermore, adjudication of his lawsuit "would necessarily require inquiry and discovery" into the discussions and deliberations that led to the alleged general policy and to its application to the circumstances at issue in this case. *Id. See also* SAC ¶ 16 (alleging that Special Agent Haugen was assigned to "Chinese

---

[3] Although Xi does not explicitly say so in his amended complaint, at least one of the prosecutions he refers to—in addition to his own prosecution, *see* SAC ¶ 1—involved allegations of theft of sensitive information for China. *See* Ex. 1, Superseding Indictment in *United States v. Guoqing Cao, et al.*, ¶¶ 32-64 (alleging that defendants transferred trade secrets to entities in China). In considering a Rule 12(b)(6) motion, courts may take judicial notice of documents filed with a court. *See U.S. ex rel. Spay v. CVS Casemark Corp.*, 913 F. Supp. 2d 125, 139 (E.D. Pa. 2012) ("On a motion to dismiss, courts must take judicial notice of documents which are matters of public record such as . . . court-filed documents . . . ." (citations and internal quotations omitted)).

counterintelligence" at the FBI). As the *Abbasi* Court concluded, "[t]hese consequences counsel against allowing a *Bivens* action" because the burdens of litigation may prevent present and future Executive Branch officials from "devoting the time and effort required for the proper discharge of their duties." 137 S. Ct. at 1860.

In sum, Xi's claims seek to extend *Bivens* into a new context. They also raise multiple special factors that have been recognized by the Supreme Court, the Third Circuit, and other courts of appeals. This Court should therefore dismiss his claims against Special Agent Haugen.[4]

## II.    Special Agent Haugen Is Entitled to Qualified Immunity on Xi's Claims.

Even if special factors did not bar Xi's claims, which they do, this Court should dismiss those claims because Special Agent Haugen is entitled to qualified immunity. Xi seeks damages from the personal resources of an individual federal official. The Supreme Court has long recognized that such personal-capacity suits "entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). In light of these concerns, government officials performing discretionary functions are protected by qualified immunity and cannot be liable unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

For a right to be clearly established, the "contours" of the right "must be sufficiently clear

---

[4] Because existing precedent and the special factors outlined above clearly compel rejection of Xi's proposed *Bivens* claims, it is unnecessary to separately consider whether other avenues of potential redress "amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie*, 551 U.S. at 550) (citation and internal quotations omitted). *See also Wilkie,* 551 U.S. at 551-52 (identifying these possibilities).

that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640. The Court has "repeatedly" instructed lower courts "not to define clearly established law at a high level of generality." *Ashcroft v. Al-Kidd*, 563 U.S. 731, 742 (2011). Instead, the law must be defined "in a more particularized, and hence more relevant, sense." *Anderson*, 483 U.S. at 640. In essence, qualified immunity contains a "fair notice" requirement. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). It is meant to protect all but the "plainly incompetent" or those who "knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). And although guiding precedent need not be directly on point for a right to be clearly established, "existing precedent must have placed the  . . . constitutional question *beyond debate*." *Al-Kidd*, 563 U.S. at 741 (emphasis added). Therefore, to overcome a qualified immunity defense, a complaint must demonstrate two things: that a constitutional right was violated, and that the contours of the right violated were clearly established "beyond debate." *Id.*

Here, Xi has failed to allege facts demonstrating that any constitutional right was violated. At bare minimum, he has failed to allege the violation of a clearly established right.

### A.  Special Agent Haugen Had Probable Cause.

Xi's claims under the Fourth Amendment for malicious prosecution and unlawful search and seizure pursuant to a search warrant, Counts I and III, fail to state a constitutional violation because Special Agent Haugen had probable cause to support the prosecution of Xi and to search his house. The Fourth Amendment requires that "[t]he right of the people to be secure in their persons, houses, papers, effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U.S. Const. amend. iv. Here, the

grand jury indictment of Xi and the issuance of a search warrant against Xi's house both demonstrate that Special Agent Haugen had probable cause.[5]

A grand jury indictment "constitutes prima facie evidence of probable cause to prosecute." *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989). Similarly, a search warrant is entitled to a "general presumption that an affidavit of probable cause supporting a search warrant is valid." *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). *Cf. Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" (citing *United States v. Leon*, 468 U.S. 897, 922-923 (1984))). The only way to rebut the presumption of probable cause resulting from an indictment is to produce evidence that the indictment was "procured by fraud, perjury or other corrupt means." *Rose*, 871 F.2d at 353 (citations omitted). Regarding the presumptive validity of a search warrant, Xi must make a "substantial preliminary showing" that the affidavit underlying the search warrant "contained a false statement which was made knowingly or with reckless disregard for the truth," and that the false statement was "material to the finding of probable cause." *Yusuf*, 461 F.3d at 383 (citation and quotation omitted).

---

[5] Because Xi's Fifth Amendment claim under Count I for "fabrication of evidence," SAC at 26, is based on the same alleged facts and circumstances as his Fourth Amendment malicious prosecution claim, the claims are legally indistinguishable and this Court should dismiss the Fifth Amendment claim as duplicative of the Fourth Amendment malicious prosecution claim. *See Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 ("The Fourth Amendment was tailored explicitly for the criminal justice system, and . . . has always been thought to define the 'process that is due' for seizures of person or property in criminal cases . . . ."); *see also Levantino v. Skala*, 56 F. Supp. 3d 191, 203 (E.D.N.Y. 2014) ("[T]he Plaintiff's procedural due process claim cannot be predicated upon the same factual basis as his Fourth Amendment false arrest and false imprisonment claims." (citing cases)).

Xi alleges no facts that if proven would meet either standard. Instead, Xi offers conclusory allegations that are precisely the sort that this Court must ignore under *Iqbal.* Indeed, Xi's assertion that Special Agent Haugen "intentionally, knowingly, and recklessly provided federal prosecutors with false scientific opinions and conclusions" regarding Xi's interactions with individuals and entities in China is simply a rephrasing of the standards announced in *Rose* and *Yusuf.* In other words, it is a "formulaic recitation" of the legal standard to rebut the presumption of probable cause that the grand jury indictment and the search warrant created.

To the extent Xi challenges the specific representations Special Agent Haugen purportedly caused to be made in the indictment, and, more relevantly, the accuracy of those representations, *see* SAC ¶¶ 49-52, Xi in effect argues that Special Agent Haugen simply got the science wrong regarding the thin film superconducting technology produced by the American company and the thin film superconducting projects Xi communicated and proposed to entities in China. The science behind thin film superconducting technologies—be they magnesium diboride thin films or oxide thin films—undoubtedly is sophisticated, complex, and highly specialized. Xi's allegation that Special Agent Haugen "had no scientific or other basis to allege" that Xi's interactions with Chinese entities was unlawful, SAC ¶ 56, in essence argues that Special Agent Haugen was negligent in his research of thin film superconducting technology.

Indeed, Xi's earlier complaint stated that Special Agent Haugen lacked "a basic understanding of the science" involved in Xi's projects, and "failed to consult with qualified scientists," Am. Compl. ¶ 51, suggesting that Special Agent Haugen did not speak with the *right* scientists, and negligently failed to conduct *enough* research to understand properly the sophisticated technology at hand. Although the second amended complaint is now the operative complaint, a mere alteration of what in any event are "labels and conclusions" regarding Special

Agent Haugen's state of mind and efforts during his investigation cannot obfuscate the underlying nature of Xi's factual claims against Special Agent Haugen, which are that he simply misunderstood and misinterpreted the facts. In other words, at bottom, Xi's claim is for negligence. Moreover, Xi and the other plaintiffs have brought a negligence claim against the United States in their FTCA suit. *See* SAC at p.31.

But allegations of negligence do not give rise to a Fourth Amendment violation. *See Herring v. United States*, 555 U.S. 135, 145 (2009) ("In *Franks*, we held that police negligence in obtaining a warrant did not even rise to the level of a Fourth Amendment violation . . . ." (discussing *Franks v. Delaware*, 438 U.S. 154 (1978))); *see also Seeds of Peace Collective v. City of Pittsburgh*, 453 F. App'x 211, 216 (3d Cir. 2011) (citing and quoting *Herring*); *Yusuf*, 461 F.3d at 383 (noting that "negligence or innocent mistake is insufficient" to invalidate a warrant (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000) (internal alteration and citation omitted))).

Moreover, the Fourth Amendment does not require "factual accuracy." *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990). Rather, it requires reasonableness. *Id.* at 184. And "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment." *Id.* at 185 (citation and quotation omitted). Here, Special Agent Haugen's research—despite leading to a purportedly inaccurate conclusion—were reasonable efforts on his part to understand Xi's proposed projects with Chinese entities. That, coupled with the grand jury indictment, demonstrates that Special Agent Haugen had probable cause. Therefore, Xi's Fourth Amendment claims must be dismissed.

**B.  Special Agent Haugen did not commit a clearly established violation.**

Additionally, any mistakes Special Agent Haugen made regarding the science of superconducting thin film technology were mistakes of fact, for which Special Agent Haugen is still entitled to qualified immunity. The Supreme Court has made this point clear: "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). *See Montanez v. Thompson*, 603 F.3d 243, 250 (3d Cir. 2010) (quoting *Pearson*). Indeed, given the patent complexity of the technologies underlying superconducting thin films and their production, Special Agent Haugen's alleged mistakes and misunderstandings cannot be those of one who is "plainly incompetent." *Malley*, 475 U.S. at 341. Instead, they at most represent incorrect conclusions drawn with respect to complicated, sophisticated technologies. Such mistakes do not constitute a clearly established violation of the Fourth Amendment. *See District of Columbia v. Wesby*, No. 15-1485, 2018 WL 491521, at *11 (U.S. Jan. 22, 2018) ("[W]e have stressed the need to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." (citation and internal quotations omitted)). Accordingly, this Court should dismiss Xi's Fourth Amendment claims regarding his indictment and the searches conducted pursuant to court orders, Counts I and III.

**C.  Xi Fails To Allege Facts Supporting a Violation of the Equal Protection Clause.**

Furthermore, Xi has failed properly to allege that his equal protection rights were violated because he has not alleged that he was treated differently than other similarly situated individuals. Additionally, his allegations of racial and ethnic animus are conclusory and implausible. To establish an equal protection violation, a plaintiff "must show that similarly

situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465 (1996). *See also Day v. Ibeson*, 530 F. App'x 130, 134 (3d Cir. 2013) ("Day did not allege sufficient facts to state a Fifth Amendment equal protection claim because he has not alleged that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus."); *United States v. Hedaithy*, 392 F.3d 580, 607 (3d Cir. 2004) (discussing *Armstrong*).

Xi has failed to meet this standard. He has not alleged that he was treated differently than anyone else similarly situated to him. *See generally*, SAC. That is fatal to his equal protection claim.

Moreover, Xi's allegations of racial and ethnic animus are conclusory, and simply are not plausible. First, Xi's claim that Special Agent Haugen's "investigation of Professor Xi was predicated at least in part on the fact that Professor Xi is racially and ethnically Chinese" *id.* ¶ 69, and that Special Agent Haugen "considered Professor Xi's race and ethnicity in providing false information" with the "intent to secure false charges," *id.* ¶ 70, are "bare assertions" that amount to "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim." *Iqbal*, 556 U.S. at 681. Accordingly, "the allegations are conclusory and not entitled to be assumed true." *Id.*

Second, the allegations of racial and ethnic animus are not plausible. Xi's intimation that the United States has engaged in invidious discrimination against citizens of Chinese origin, SAC ¶¶ 68-70, in its efforts to combat Chinese espionage is similar to the discriminatory claims plaintiffs made in *Iqbal*, which the Court found to be implausible. There, plaintiffs alleged that, in the wake of the September 11 terrorist attacks, the Department of Justice and the FBI subjected Arab Muslims to detention and harsh conditions of confinement solely on account of

those individuals' religion, race, and ethnicity. *See Iqbal*, 556 U.S. at 669. In rejecting that claim, the Court noted that the September 11 terrorist attacks were perpetrated by Arab Muslim hijackers "who counted themselves in good standing of al Qaeda, an Islamic fundamentalist group." *Id.* at 682. As such, it "should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims." *Id.*

So too here. It should come as no surprise that legitimate United States law enforcement efforts to prosecute and thereby stem the illegal flow of sensitive technologies and information from the United States to China "would produce a disparate, incidental impact" on persons communicating about technology with people and entities in China. Likewise, it should come as no surprise that many of those incidentally impacted would be persons of Chinese ethnicity, "even though the purpose of" such a policy was not to target Chinese Americans. As between the "obvious alternative explanation" for the arrest of Xi and "the purposeful, invidious discrimination" Xi asks this Court to infer, "discrimination is not a plausible conclusion." *Id.* In sum, Xi has failed to allege that he was treated differently than others similarly situated to him on account of his race or ethnicity. His discrimination allegations are conclusory. And they are not plausible. This Court should dismiss Xi's equal protection claim.

## **CONCLUSION**

Xi asserts he was accused of acting as a technological spy for China. Adjudication of his claims would implicate national security, foreign policy, a review of classified information, and the United States' general efforts to combat espionage. In such a context, the Supreme Court has made clear that courts should not infer a damages remedy. Moreover, Xi has not stated facts

demonstrating the violation of a clearly established right. For these and the other reasons stated

above, this Court should dismiss Xi's claims against Special Agent Haugen with prejudice.


Dated: January 23, 2018     Respectfully submitted,

               CHAD A. READLER
               Acting Assistant Attorney General
               Civil Division

               C. SALVATORE D'ALESSIO, Jr.
               Acting Director, Torts Branch

               RICHARD MONTAGUE
               Senior Trial Counsel

                /s/  *Paul E. Werner*
               PAUL E. WERNER
               (MD Bar, under LCvR 83.5(e))
               Trial Attorney
               United States Department of Justice
               Torts Branch, Civil Division
               P.O. Box 7146
               Washington, D.C.  20044
               (202) 616-4152 (phone)
               (202) 616-4314 (fax)
               E-mail: Paul.Werner@usdoj.gov

               Attorneys for Special Agent Haugen