**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


XIAOXING XI, ET AL.                    :
                                       :        CIVIL ACTION
               v.                      :
FBI SPECIAL AGENT                      :        NO. 17-2132
ANDREW HAUGEN, ET AL.                  :


**MEMORANDUM**

**SURRICK, J.**                                    **MARCH 31, 2021**


## I.     INTRODUCTION

This lawsuit arises from the United States government's investigation, arrest, and

subsequently dismissed indictment of Temple University physics Professor Xiaoxing Xi ("Xi")

on charges that essentially accused him of being a "technological spy" for China.  (*See* Second

Am. Complaint ("SAC") ¶ 1, ECF No. 26; *see also United States v. Xi*, No. 15-cr-204 (E.D.

Pa.).)  In this action, Xi and his wife and adult daughter, Qi Li and Joyce Xi, respectively, seek

redress for the harms they suffered as a result of the government's allegedly unfounded and

malicious investigation and prosecution of Xi.

Xi asserts constitutional claims under *Bivens v. Six Unknown Named Agents of Federal

Bureau of Narcotics*, 403 U.S. 388 (1971), against FBI Special Agent Andrew Haugen, the lead

agent in the investigation,[1] and Xi and the other Plaintiffs assert claims against the United States

_____

[1] All of Xi's *Bivens* claims are asserted against Haugen and John Doe Defendant(s), who
are alleged to be "federal law enforcement agents, supervisors, and other officials who
participated in the investigation and prosecution of Professor Xi."  (SAC ¶ 17.)  Because
Plaintiffs have not yet identified or served process upon the John Doe Defendant(s), this
Memorandum addresses Xi's *Bivens* claims only as to Agent Haugen.

under the Federal Tort Claims Act ("FTCA").[2]   Plaintiffs also assert a constitutional claim

against FBI Director Christopher A. Wray, U.S. Attorney General William P. Barr, and National

Security Agency ("NSA") Director/Central Security Service Chief General Paul M. Nakasone, in

their official capacities ("the "Official Capacity Defendants"), seeking declaratory and injunctive

relief regarding the government's search, seizure, and retention of Plaintiffs' information and

property.[3]

Presently before the Court are the following motions by Haugen and the United States

seeking dismissal of all claims asserted against them in the SAC:  Haugen's Motion to Dismiss

Xi's *Bivens* claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (Haugen Mot., ECF No.

35); and the United States' Motion to Dismiss Plaintiffs' FTCA claims pursuant to Rules

12(b)(1) and 12(b)(6) (U.S. Mot., ECF No. 34).[4]  These motions implicate, among other issues,

the evolving decisional law regarding the availability of a *Bivens* remedy to plaintiffs alleging

constitutional violations by federal agents, and the scope of the "discretionary function"

exception under the FTCA.  Regarding Xi's Fourth and Fifth Amendment *Bivens* claims, in

particular, the current legal standards are "perplexing" to say the least.  *See Graber v. Dales*, No.

---

[2] The FTCA, codified in multiple sections of Title 28 of the United States Code, "operates as a limited waiver of the United States' sovereign immunity."  *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456-57 (3d Cir. 2010).

[3] The SAC originally named former U.S. Attorney General Jefferson B. Sessions and former NSA Director/Central Security Service Chief Admiral Michael S. Rogers as Official Capacity Defendants.  (SAC ¶¶ 20-22.)  Pursuant to Federal Rule of Civil Procedure 25(d), the current Attorney General and NSA Director are automatically substituted for former Attorney General Sessions and former NSA Director Admiral Rogers.

[4] The Official Capacity Defendants have also filed a Motion to Dismiss the claim against them pursuant to Rules 12(b)(1) and 12(b)(6).  (Off. Cap. Mot., ECF No. 38).  The Official Capacity Defendants' Motion will be addressed in a separate Memorandum and Order.

18-3168, 2019 WL 4805241, at *3 (E.D. Pa. Sept. 30, 2019) (describing the current *Bivens*

analysis as "perplexing").  Given the current state of the law, our analysis includes a survey of

relevant decisions by the Supreme Court and other federal courts, followed by application of the

principles gleaned therefrom to the unique facts of this case.  Based on our application of the

current law, we are compelled to dismiss Plaintiff's *Bivens* claims against Haugen and their

FTCA claims against the United States.

## II.    BACKGROUND

### A.    Factual Background[5]

Xi is an internationally recognized expert in the field of thin film superconducting

technology.  (SAC ¶¶ 1, 25.)  Xi alleges that in his capacity as a professor and researcher, he

engaged in appropriate communications and collaboration with other scientists in China.  (*Id.*

¶¶ 3-4.)  Xi and Qi Li, a physics professor at the Pennsylvania State University, are naturalized

U.S. citizens who emigrated from China and have lived in the United States since 1989.

(*Id.* ¶¶ 12-13.)  Joyce Xi, the eldest daughter of Xi and Qi Li, was born in the United States and

is a 2016 graduate of Yale University.  (*Id.* ¶ 14.)  Xi and Qi Li also have another daughter, who

is a minor and is not a Plaintiff in this case.  During the time relevant to this lawsuit, Xi and his

wife and daughters resided together in Penn Valley, Pennsylvania.  (*Id.* ¶¶ 12-14.)  According to

---

[5] The background is derived from the SAC, the well-pleaded factual allegations of which
are accepted as true and construed in the light most favorable to Plaintiffs as the non-moving
parties.  *See McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) ("In deciding a motion
to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in
the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them."
(quoting *Schrob v. Catterson*, 948 F.2d 1402, 1408 (3d Cir. 1991))); *see also City of Cambridge
Ret. Sys. v. Altisource Asset Mgmt. Corp*, 908 F.3d 872, 878-79 (3d Cir. 2018) (noting that in
ruling on motions to dismiss, court must "disregard threadbare recitals of the elements of a cause
of action, legal conclusions, and conclusory statements." (internal citation and quotation
omitted)).

the SAC, Haugen has been an FBI Special Agent since approximately 2011 and is assigned to

Chinese counterintelligence out of a field office in this District.  (*Id.* ¶ 16.)

### 1.    *Xi's Indictment and Arrest*

On May 14, 2015, a grand jury in this District returned a sealed Indictment against Xi,

alleging that he fraudulently obtained and shared with entities in China information concerning a

"pocket heater" belonging to Superconductor Technologies, Inc. ("STI"), a U.S. company.  (*Id.*

¶¶ 1, 24; *see also United States v. Xi*, Indictment, ECF No. 1.)    The STI pocket heater is a

device used for depositing magnesium diboride thin films on flat surfaces.  (SAC ¶ 27.)  The

Indictment alleged that Xi:

> reproduced, sold, transferred, distributed, and otherwise shared the [pocket heater]
> and the technology of the [pocket heater] with and exploited it for the benefit of
> third parties in China, including government entities, and attempted to do so, both
> personally and through the assistance of his post-doctoral students from China, in
> an effort to help Chinese entities become world leaders in the field of
> superconductivity.

(Indictment ¶ 11; *see also* SAC ¶¶ 30-31.)  The Indictment charged Xi with four counts of wire

fraud, each based on a separate email from Xi to individuals in China.  (SAC ¶¶ 30-31.)  The

emails upon which the Indictment was based are described therein as follows:

- May 14, 2010 [e]-mail communication from [Xi] to J.L., an associate in China,
  confirming that certain technology had been delivered to a laboratory in China,
  and offering his personal assistance therewith (Count One);

- June 2, 2010 [e]-mail communication from [Xi] to Y.W., an associate in China,
  offering to build a world-class thin film laboratory in China (Count Two);

- June 2, 2010 [e]-mail communication from [Xi] to X.J., and associate in China,
  offering to build a world-class thin film laboratory in China (Count Three); and

- December 9, 2010 [e]-mail communication from [Xi] to J.Z, and associate in
  China, offering to build a world-class thin film laboratory in China (Count
  Four).

(Indictment ¶ 13.)

4

The same day that the Indictment was filed, United States Magistrate Judge Richard A. Lloret issued a bench warrant for Xi's arrest.  (*See United States v. Xi*, Dkt., 5/14/2015 text entry.)  In the early morning hours of May 21, 2015, FBI agents arrested Xi at his home on the charges alleged in the Indictment.[6]  (SAC ¶¶ 32-33.)  Xi's wife and daughters were at home and were detained at gunpoint during Xi's arrest.  (*Id.* ¶ 34.)  After his arrest, Xi was taken to the FBI's Philadelphia field office, where he underwent DNA sampling, was photographed and fingerprinted, and was interrogated for two hours.  (*Id.* ¶ 36.)  Xi was then placed in the custody of the U.S. Marshal's Service and was required to disrobe and submit to a visual body cavity search.  (*Id.* ¶ 37.)  After his initial court appearance, Xi was released on bond, subject to travel and other restrictions.  (*Id.* ¶ 39.)  The U.S. Attorney's Office issued a press release announcing Xi's Indictment, which he alleges caused him "to be falsely portrayed as an economic spy for China."  (*Id.* ¶ 40.)  Xi's indictment and arrest were also widely reported in national and international news media.  (*Id.* ¶¶ 40, 87.)  As a result of his arrest, Temple placed Xi on administrative leave and suspended him as interim chair of the university's physics department. (*Id.* ¶ 89.)

On September 11, 2015, the government moved to dismiss the Indictment without prejudice, referring to "additional information [that had come] to the attention of the government."  (*United States v. Xi*, ECF No. 29.)  Xi alleges that the government abandoned the prosecution after Xi's attorneys demonstrated that the emails underlying the Indictment were innocent and did not pertain to the pocket heater technology.  (SAC ¶¶ 42-52.)  On September

---

[6] The Indictment was also unsealed on May 21, 2015.  (*See United States v. Xi*, Dkt., 5/21/2015 text entry.)

18, 2015, the Court dismissed the Indictment without prejudice as requested in the government's motion.  (*United States v. Xi*, ECF No. 30.)

        2.     *Plaintiffs' Allegations Regarding the Investigation and Indictment*

As the essential basis for this lawsuit, Plaintiffs allege that the criminal charges against Xi were false and based on Haugen's intentional, knowing, and/or reckless false statements and representations and material omissions of facts in connection with the investigation and Indictment.  (SAC ¶¶ 41, 54.)  Plaintiffs further allege that Haugen's investigation of Xi was motivated at least in part by Xi's race and ethnicity, specifically, his Chinese heritage.  (*Id.* ¶¶ 69-70.)

Plaintiffs allege that contrary to the Indictment, Xi did not "share any information regarding the STI pocket heater in violation of federal law."  (*Id.* ¶ 42.)  Specifically, Plaintiffs assert that the STI pocket heater, its components, and its related technology were based on a prior invention, were widely known and publicly accessible, were not considered trade secrets, and were not otherwise protected from disclosure by federal law.  (*Id.* ¶¶ 43-45.)  According to Plaintiffs, Xi purchased a version of the STI pocket heater in 2006 from Shoreline Technologies, a company owned by one of the two inventors of the device.  (*Id.* ¶ 47.)  In connection with that purchase, Xi agreed "not to reproduce, sell, transfer or otherwise distribute" the pocket heater "to any third party" for a period of twelve months.  (*Id.*)  Xi complied in all respects with that agreement.  (*Id.*)

Plaintiffs allege that all four of the emails that were the basis for the Indictment referred not to the STI pocket heater but to other unrelated technologies, and all were part of normal, appropriate academic collaboration.  (*Id.* ¶¶ 49-51.)  As described in the SAC, the email that was the basis of Count One of the Indictment referred to a device being tested in connection with a

process—Hybrid Physical Chemical Vapor Deposition ("HPCVD")—that Xi and colleagues at the Shanghai Institute of Applied Physics ("SINAP") invented as part of normal academic collaboration. (*Id.* ¶ 49.)  The emails underlying Counts Two through Four also were unrelated to the pocket heater and involved the creation of a laboratory for research of oxide thin films, an entirely distinct technology for which the pocket heater would have no purpose. (*Id.* ¶ 50.)

According to Plaintiffs, "the charges against [Xi] were "false, malicious, and entirely fabricated." (*Id.* ¶ 2.)  Plaintiffs allege that the facts demonstrating the accurate and benign nature of Xi's communications were known to and recklessly disregarded by Haugen, who "intentionally, knowingly and/or recklessly made or caused to be made false statements and representations and material omissions of facts in his reports, affidavits, and other communications with federal prosecutors, thereby initiating a malicious prosecution of Professor Xi, as evidenced by false allegations made in the [I]ndictment and false testimony given by Defendant Haugen before the grand jury." (*Id.* ¶¶ 53-54; *see also id.* ¶¶ 2-4.)  Plaintiffs allege that Haugen's intentional, knowing and/or reckless false statements and omissions included:

- The false assertion that Professor Xi had built a version of the pocket heater for SINAP.  Defendant Haugen knew or recklessly disregarded the fact that the tubular heating device Professor Xi discussed with colleagues at SINAP was an entirely different device.  Defendant Haugen was told by an inventor of the STI pocket heater that the diagrams of the SINAP tubular heating device were not related to the STI pocket heater but, rather, the HPCVD process Professor Xi invented.

- The false assertion that the STI pocket heater was a "revolutionary" device.  Defendant Haugen was informed that the STI pocket heater was not protected or considered a trade secret.  Defendant Haugen knew that the STI pocket heater was a modification of an existing "Kinder" pocket heater that had been created in the 1990s, and he knew that the technology was widely known and shared in the relevant scientific community.

- The false assertion that Professor Xi repeatedly sought to orchestrate a scheme to obtain the STI pocket heater technology. Defendant Haugen knew or recklessly disregarded the fact that at the time he alleged Professor Xi initiated this scheme, STI had not yet invented the pocket heater.  Defendant Haugen

7

knew or recklessly disregarded the fact that STI solicited Professor Xi's help in securing funding for and developing the STI pocket heater before and during his sabbatical leave at Stanford University and STI. Defendant Haugen knew or recklessly disregarded the fact that, as a world-renowned expert in the field of magnesium diboride thin film technology and inventor of the HPCVD process that produces higher quality magnesium diboride thin films than the STI pocket heater, there was no need for Professor Xi to orchestrate a scheme to obtain the publicly available technology of the STI pocket heater.

- The false assertion that Professor Xi purchased a pocket heater from STI with fraudulent intent to violate a non-disclosure agreement. Defendant Haugen knew that Professor Xi did not purchase the pocket heater from STI, but from Shoreline Technologies, owned by one inventor of the pocket heater, and that Professor Xi signed a non-disclosure agreement only after STI claimed ownership of the pocket heater and requested that Professor Xi sign the agreement as the condition for him to lease the pocket heater after Professor Xi made the purchase from Shoreline Technologies.

- The false assertion that Professor Xi had transmitted diagrams and/or photographs of the STI pocket heater to colleagues at Peking University. Defendant Haugen was in possession of Professor Xi's emails and was in possession of schematics attached to those emails. Based on these emails, Defendant Haugen knew or recklessly disregarded the fact that Professor Xi never sent a photograph of the STI pocket heater to colleagues at Peking University. Based on these emails, Defendant Haugen knew or recklessly disregarded the fact that the schematics attached to the emails were of the HPCVD process Professor Xi invented, which was entirely different from the STI pocket heater.

- The false assertion that Professor Xi had transmitted photographs of the STI pocket heater to colleagues at Tsinghua University. Based on Professor Xi's emails, Defendant Haugen knew or recklessly disregarded the fact that Professor Xi never sent a photograph of the STI pocket heater to colleagues at Tsinghua University and that his emails with colleagues there involved a separate heater for the creation of oxide films—an entirely different technology from the STI pocket heater.

- The false assertion that Professor Xi had repeatedly shared samples produced by the pocket heater with entities in China. Based on Professor Xi's emails, Defendant Haugen knew or recklessly disregarded the fact that Professor Xi never sent samples produced by the pocket heater to colleagues in China and that the exchanges of samples and test results that Professor Xi engaged in with colleagues in China were consistent with normal academic collaboration and did not involve the STI pocket heater.

(*Id.* ¶ 55.)

8

Plaintiffs allege that as a result of the false information provided by Haugen, they have

been subjected to unlawful and unconstitutional searches, seizures, and retention of their

property and communications, including electronic devices, financial records, emails, text

messages, and phone calls.  (*Id.* ¶¶ 59-67.)  According to Plaintiffs, Haugen's falsifications and

withholding of exculpatory evidence caused the issuance of orders under the Foreign Intelligence

Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1801, *et seq.*, which were based on affidavits

containing "known and/or reckless false statements and representations and material omissions

of fact."  (*Id.* ¶ 59.)  Plaintiffs allege that both before and after issuance of the FISA orders,

Haugen caused warrantless surveillance of Xi's communications under the purported authority of

Section 702 of FISA ("Section 702"), 50 U.S.C. § 1881a,[7] and Executive Order 12,333 ("EO

12,333"),[8] and then relied on information obtained from that surveillance to obtain FISA orders

---

[7] Section 702 "allows the Attorney General and the Director of National Intelligence to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not 'United States persons' and are reasonably believed to be located outside the United States.  Before doing so, the Attorney General and the Director of National Intelligence normally must obtain the Foreign Intelligence Surveillance Court's approval."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

[8] EO 12,333, issued by President Ronald Reagan in 1981, "'provide[s] for the effective conduct of United States intelligence activities and the protection of constitutional rights.'"  *Am. Civil Liberties Union v. Nat'l Sec. Agency*, No. 13-9198, 2017 WL 1155910, at *1 (S.D.N.Y. Mar. 27, 2017) (providing background of EO 12,333) (citations omitted).  EO 12,333 "stated that '[t]imely, accurate, and insightful information about the activities, capabilities, plans, and intentions' of foreign entities is 'essential to informed decisionmaking in the areas of national security, national defense, and foreign relations,' such that '[c]ollection of such information is a priority objective and will be pursued in a vigorous, innovative, and responsible manner that is consistent with the Constitution and applicable law and respectful of the principles upon which the United States was founded.'" *Id.* (citing EO 12,333 § 2.1).

EO 12,333 is one of the primary authorities that allows government agencies to gather foreign intelligence.  *Id.*  "The Order allows for the collection, retention, and dissemination of information concerning United States citizens, at home and abroad, in certain limited situations, such as information obtained incidentally to a lawful foreign intelligence investigation."  *Id.* (citation omitted).  Critics of EO 12,333 have questioned whether the NSA and other agencies

and search warrants targeting Xi.  (SAC ¶¶ 59-65.)  Plaintiffs further allege that Haugen made known or reckless false statements and omissions in support of the warrants used to search and seize Plaintiffs' property at their home and Xi's offices in connection with Xi's arrest.  (*Id.* ¶ 67.)

Plaintiffs allege that their private communications and other personal property remain in the possession of the U.S. government, including the FBI, the Department of Justice, and/or the NSA.  (*Id.* ¶¶ 63, 84, 86.)  Plaintiffs also allege that Haugen knew the United States Attorney's Office would publicize Xi's Indictment and arrest, and that the decision to conduct a raid and arrest at Xi's home would cause and increase publicity falsely portraying Xi as a spy for China.  (*Id.* ¶ 75.)

As a result of Defendants' alleged unconstitutional and tortious conduct, Plaintiffs allege that they have suffered substantial economic and other damages, including lost past and future income, "loss of liberty, invasion of privacy, . . . emotional distress and harm, loss of reputation, and physical harms caused by the emotional distress."  (*Id.* ¶ 76; *see also id.* ¶¶ 2, 87-97.)

## B.     Procedural History

Xi filed this lawsuit on May 10, 2017, alleging in his initial Complaint five *Bivens* claims against Haugen and John Doe Defendant(s).[9]  (Compl., ECF No. 1.)  On July 7, 2017, Plaintiffs filed a First Amended Complaint ("FAC"), which alleged the same five *Bivens* claims and added

---

collect information about U.S. citizens that is "only tangentially related to foreign investigations."  *Id.* (citations omitted).

[9] In his original Complaint, Xi asserted the following *Bivens* claims:  malicious prosecution, under the Fourth Amendment (Count I); equal protection and due process violation, under the Fifth Amendment (Count II), unlawful search and seizure – FISA Orders, under the Fourth Amendment (Count III); unlawful search and seizure – warrantless surveillance, under the Fourth Amendment (Count IV); and unlawful search and seizure of property and belongings at Xi's home and office, under the Fourth Amendment (Count V).  (Compl. ¶¶ 72-82.)

six FTCA claims against the United States.[10]  (FAC, ECF No. 8.)  The United States and Haugen

each moved to dismiss the FAC.  (ECF Nos. 15, 16.)  When those motions were pending, the

parties stipulated that Plaintiffs would seek leave to file a SAC naming additional government

officers in their official capacities and, if leave to amend was granted, Defendants would have

sixty days to respond to the amended pleading.  (ECF No. 17.)  The Court granted Plaintiffs

leave to file the SAC and dismissed as moot Defendants' motions to dismiss the FAC.  (ECF

Nos. 25, 27.)

On October 31, 2017, Plaintiffs filed the SAC, which alleges the following ten claims:

- *Bivens* claim for malicious prosecution and fabrication of evidence, under the Fourth and Fifth Amendments (Count I);

- *Bivens* claim for equal protection and due process violation, under the Fifth Amendment (Count II);

- *Bivens* claim for unlawful search and seizure of property and belongings at Xi's home and office, under the Fourth Amendment (Count III);

- FTCA claims by Xi for malicious prosecution (Count IV) and invasion of privacy—false light (Count VI);

- FTCA claims by all Plaintiffs for invasion of privacy—intrusion upon seclusion (Count V), intentional infliction of emotional distress (Count VII), negligent infliction of emotional distress (Count VIII), and negligence (Count IX); and

- Constitutional claim by all Plaintiffs against the Official Capacity Defendants for return and expungement of information and property unlawfully searched and seized in violation of the Fourth Amendment (Count X).

Notably, the SAC does not include the previously alleged *Bivens* claims challenging the FISA

orders and the warrantless surveillance conducted pursuant to Section 702 and EO 12,333.

---

[10] When the initial Complaint was filed, Plaintiffs had not yet completed the administrative exhaustion of their FTCA claims against the United States.  (*See* Pls.' Unopposed Mot. to Amend ¶¶ 2-3, ECF No. 6.)

In response to the SAC, the United States and Haugen filed the Motions to Dismiss that are the subject of this Memorandum.  Plaintiffs filed a Consolidated Response in Opposition to the motions of Haugen and the United States.  (Pls.' Cons. Opp., ECF No. 41).  The United States and Haugen each filed a Reply in support of their respective Motions.  (U.S. Reply, ECF No. 45; Haugen Reply, ECF No. 46.)   Xi filed a Notice of Supplemental Authority regarding Haugen's Motion, to which Haugen filed a response.  (ECF Nos. 48, 49.)  On February 6, 2020, Plaintiffs filed another Notice of Supplemental Authority in support of their opposition to Haugen's and the Official Capacity Defendants' Motions to Dismiss.  (ECF No. 52.)  On February 21, 2020, the Official Capacity Defendants and Haugen filed a Motion to Strike this most recent Notice of Supplemental Authority.  (ECF No. 53.)  On March 12, 2020, Plaintiffs filed a Response in Opposition to Defendants' Motion to Strike the most recent Notice of Supplemental Authority (ECF No. 56), and on March 19, 2020, the Official Capacity Defendants and Haugen filed a Reply in support of their Motion to Strike (ECF No. 57).  These supplemental submissions do not alter our analysis regarding the Motions resolved in this Memorandum and Order.

## III.    LEGAL STANDARD

### A.    Rule 12(b)(1)

Under Rule 12(b)(1), a court must grant a motion to dismiss if it lacks subject matter jurisdiction over the case.  The party asserting that jurisdiction is proper bears the burden of showing that jurisdiction exists.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Packard v. Provident Nat'l Bank*, 994 F.2d 1039, 1045 (3d Cir. 1993).  A challenge to subject matter jurisdiction may be either factual or facial.  *See CNA v. United States*, 535 F.3d 132, 145 (3d Cir. 2008) (citing 5B Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 1350, at 147–55 (3d ed. 2004)).  The parties agree, as do we, that the United States raises a facial challenge to the Court's subject matter jurisdiction.  (U.S. Mot. 5; Pls.' Cons. Opp. 10 n.2.)  When considering a facial challenge, the court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citation omitted).

"When a court is faced with 12(b)(1) and 12(b)(6) motions to dismiss, as a general rule, the correct procedure is to consider dismissal on the jurisdictional ground first, 'for the obvious reason that if the court lacks jurisdiction to hear the case then a fortiori it lacks jurisdiction to rule on the merits.'" *Watson v. Dep't of Servs. for Children, Youths & Their Families Delaware*, 932 F. Supp. 2d 615, 619 (D. Del. 2013) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 895 n.22 (3d Cir. 1977)); *see also Rodenbaugh v. Santiago*, No. 16-2158, 2017 WL 194238, at *5 (E.D. Pa. Jan. 18, 2017) (considering Rule 12(b)(1) motion first "because if the court lacks subject-matter jurisdiction over the claims, the motion to dismiss for failure to state a claim is moot" (citing *In re Corestates Trust Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993), *aff'd*, 39 F.3d 61 (3d Cir. 1994))).

**B.      Rule 12(b)(6)**

Under Federal Rule of Civil Procedure 8(a)(2), "[a] pleading that states a claim for relief must contain a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted.  A motion under Rule 12(b)(6) tests the sufficiency of the complaint against the pleading requirements of Rule 8(a).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A complaint that merely alleges entitlement to relief, without alleging facts that show entitlement, must be dismissed. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009). Courts need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements. . . ." *Iqbal*, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. at 679. This "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

Evaluation of a Rule 12(b)(6) motion entails a three-step analysis:  (1) "[the district court] must tak[e] note of the elements [the] plaintiff must plead to state a claim"; (2) "it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth'"; and (3) "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675, 679). The plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## IV.    DISCUSSION

### A.    *Bivens* Claims

Haugen's Motion seeks dismissal of Xi's *Bivens* claims on two bases.  First, Haugen argues that Xi's claims would impermissibly extend the *Bivens* remedy into a new context in violation of United States Supreme Court jurisprudence.  *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854-58 (2017) (cautioning against inappropriate extension of *Bivens* remedy into new contexts and providing framework to determine whether extension of *Bivens* is permissible); *see also Hernandez v. Mesa*, 140 S. Ct. 735 (2020) ("*Hernandez III*") (holding that *Bivens* may not be extended to provide remedy to parents of Mexican teenager shot and killed by U.S. Border Patrol Agent across the United States-Mexico border).[11]  Second, Haugen contends that even if Xi's *Bivens* claims are cognizable, he is entitled to qualified immunity because Xi has failed to establish that Haugen's conduct violated any clearly established constitutional right.

Because the issue of "[w]hether a *Bivens* claim exists in a particular context is 'antecedent to the other questions presented,'" and is "'a threshold question of law,'" our analysis below addresses that issue first.  *Bistrian v. Levi*, 912 F.3d 79, 88 (3d Cir. 2018) (*"Bistrian II"*) (quoting *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) ("*Hernandez I*"), and *Vanderklok v. United States*, 868 F.3d 189, 197 (3d Cir. 2017) (*"Vanderklok II"*)).  We then turn to the issue of qualified immunity, although our conclusions regarding the unavailability of the *Bivens* claims likely renders the qualified immunity analysis *dicta*.  We include it nevertheless in

---

[11] In *Hernandez III*, the Supreme Court affirmed the Fifth Circuit's *en banc* holding that the cross-border shooting at issue presented "a new context and that multiple factors—including the incident's relationship to foreign affairs and national security, the extraterritorial aspect of the case, and Congress's repeated refusals to create a damages remedy for injuries on foreign soil—counseled against an extension of *Bivens*."  *Hernandez III*, 140 S. Ct. at 741 (citing *Hernandez v. Mesa*, 885 F.3d 811, 816-23 (5th Cir. 2018) ("*Hernandez II*").

the interest of thoroughness and because the opacity of the law applicable to this case makes appellate review of our decision likely if not inevitable.

### 1.    Background and Recognized Contexts of <u>Bivens</u> Claims

Pursuant to 42 U.S.C. § 1983, enacted in 1871, federal law has historically provided a cause of action for damages to individuals whose constitutional rights are violated by state officials.  *See e.g.*, *Abbasi*, 137 S. Ct. at 1854.  However, until the Supreme Court's decision in *Bivens*, federal law did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by federal government agents.  *Id.*  In *Bivens*, the Court for the first time implied such a cause of action, holding that "even absent statutory authorization, it would enforce a damages remedy to compensate persons injured by federal officers who violated the [Fourth Amendment] prohibition against unreasonable search and seizures."[12]  *Id.* (citing *Bivens*, 403 U.S. at 397); *see also Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012) (*"Bistrian I"*) (explaining that a *Bivens* claim is the "federal analog" to an action against state officials under § 1983 (citing *Iqbal*, 556 U.S. at 675-76)); *see also Hernandez III*, 140 S. Ct. at 747 (noting that the Supreme Court has "described *Bivens* as a 'more limited' 'federal analog' to § 1983" (quoting *Hartman v. Moore*, 547 U.S. 250, 254, n.2 (2006))).  In *Bivens*, the plaintiff alleged, *inter alia*, that agents of the Federal Bureau of Narcotics, acting without a warrant, arrested him for alleged narcotics violations, handcuffed him in front of his wife and children, threatened to

---

[12] *Bivens* thus became "the short-hand name given to causes of action against federal officials for alleged constitutional violations."  *Bistrian II*, 912 F.3d at 88; *see also Vanderklok II*, 868 F.3d at 198 (discussing history of *Bivens* actions).

arrest the entire family, searched his apartment, interrogated him, and subjected him to a visual strip search.[13]  *Bivens*, 403 U.S. at 389.

Since *Bivens*, the Supreme Court has expressly recognized an implied cause of action in only two other cases.  In *Davis v. Passman*, 442 U.S. 228 (1979), the Court implied a damages remedy under the Fifth Amendment for a Congressional administrative assistant who alleged she was fired based on her gender.  The next year, in *Carlson v. Green*, 446 U.S. 14 (1980), the Court recognized a remedy under the Eighth Amendment's Cruel and Unusual Punishments clause for prison officials' failure to provide adequate medical treatment for a prisoner's asthma.

In the ensuing "nearly four decades, the Supreme Court has repeatedly refused to recognize *Bivens* actions in any new contexts."  *Vanderklok II*, 868 F.3d at 199.  Specifically, the Court has declined to imply a *Bivens* remedy in the following contexts:

> [A] First Amendment suit against a federal employer, *Bush v. Lucas*, 462 U.S. 367, 390 (1983); a race-discrimination suit against military officers, *Chappell v. Wallace*, 462 U.S. 296, 297 (1983); a substantive due process suit against military officers, *United States v. Stanley*, 483 U.S. 669, 671-672 (1987); a procedural due process suit against Social Security officials, *Schweiker v. Chilicky*, 487 U.S. 412, 414 (1988); a procedural due process suit against a federal agency for wrongful termination, *FDIC v. Meyer*, 510 U.S. 471, 473-474 (1994); an Eighth Amendment suit against a private prison operator, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 63 (2001); a due process suit against officials from the Bureau of Land Management, *Wilkie v. Robbins*, 551 U.S. 537, 547-548 (2007); and an Eighth Amendment suit against prison guards at a private prison, *Minneci v. Pollard*, 565 U.S. 118, 120 (2012).

*Abbasi*, 137 S. Ct. at 1857 (parallel citations omitted).  Indeed, the Court has noted that "[b]ecause implied causes of action are disfavored, [it] has been reluctant to extend *Bivens* liability 'to any new context or new category of defendants.'"  *Iqbal*, 556 U.S. at 675 (quoting

---

[13] The Federal Bureau of Narcotics was established in 1930 by President Herbert Hoover and is a predecessor agency to the U.S. Drug Enforcement Agency ("DEA").  *See* https://www.dea.gov/sites/default/files/2018-05/Early%20Years%20p%2012-29.pdf  (last accessed Mar. 31, 2021).  The DEA and the FBI are both law enforcement agencies of the U.S. Department of Justice.  *See* https://www.justice.gov/agencies/chart (last accessed Mar. 31, 2021).

*Malesko*, 534 U.S. at 68).  As the Court explained in *Abbasi*, requests to extend *Bivens* implicate the question:  "'[W]ho should decide' whether to provide for a damages remedy, Congress or the courts."  *Abbasi*, 137 S. Ct. at1857 (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)).  "The answer most often will be Congress."  *Id.*

### 2.    *The Supreme Court's Decision in* <u>Abbasi</u>

In *Abbasi*, the Supreme Court reaffirmed its reluctance to extend the *Bivens* remedy, declining to allow causes of action for damages under the Fourth and Fifth Amendments asserted by aliens detained after the September 11, 2001 terrorist attacks against high level federal executive officials and prison wardens regarding the confinement conditions and alleged mistreatment of the detainees.[14]  *Abbasi*, 137 S. Ct. at 1858-65.  In so holding, the Court noted that *Bivens* was the product of an "*ancien regime*" during which "the Court assumed it to be a proper judicial function to provide such remedies as are necessary to make effective a statute's purpose."  *Id.* at 1855.  The Court further observed that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today."  *Id.* at 1856; *see also Hernandez III*, 140 S. Ct. at 742 (noting that "expansion of *Bivens* is 'disfavored juridical activity.'" (quoting *Abbasi*, 137 S. Ct. at 1856-57)).

The Court also elaborated on the "rigorous inquiry that must be undertaken before implying a *Bivens* cause of action in a new context or against a new category of defendants."

---

[14] The alien detainees in *Abbasi* sought to raise *Bivens* claims alleging that they were detained in harsh pretrial conditions for a punitive purpose and because of their race, religion, or national origin, in violation of their Fifth Amendment due process and equal protection rights; that they were subjected to punitive strip searches with no legitimate penological purpose, in violation of the Fourth Amendment and their Fifth Amendment due process rights; and that the wardens knowingly allowed guards to abuse the detainees, in violation of their Fifth Amendment due process rights.  *Abbasi*, 137 S. Ct. at 1853-54.

*Vanderklok II*, 868 F.3d at 200.  Under that two-step inquiry, a court must first determine whether the case presents a "new *Bivens* context."  *Abbasi*, 137 S.Ct. at 1859.  "If the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new."  *Id.*  "Differing in a 'meaningful way,' in the very least, means 'an extension' of the *Bivens* remedy, even if just a 'modest extension.'"  *Jacobs v. Alam*, 915 F.3d 1028, 1037 (6th Cir. 2019) (quoting *Abbasi*, 137 S. Ct. at 1864 ("[E]ven a modest extension is still an extension.")); *see also Hernandez III*, 140 S. Ct. at 743 ("[O]ur understanding of a 'new context' is broad.").  Potentially meaningful differences may include, for example:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 137 S. Ct. at 1860.  If a claim presents a new *Bivens* context, the court must "turn to the second step of *Abbasi* and ask whether any 'special factors counsel[ ] hesitation' in permitting the extension."  *Bistrian II*, 912 F.3d at 90 (quoting *Abbasi*, 137 S. Ct. at 1859) (alteration in original).  If a case does not present an extension of *Bivens*, there is no need to conduct the second step of the *Abbasi* inquiry.  *Id*. at 91-92.

The second step of the *Abbasi* analysis requires the court to identify and assess any "special factors counseling hesitation" in permitting an extension of *Bivens*.  *Abbasi*, 137 S. Ct. at 1857.  Although the Court has not precisely defined "special factors counseling hesitation," it explained:

> [T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.  Thus, to be a "special factor counseling hesitation," a factor must cause a court to hesitate before answering that question in the affirmative.

It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others. It is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations. Yet the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies. These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case.

*Id.* at 1857-58.

Central to the special factors analysis are "separation-of-powers principles" under which the provision of a new damages remedy should often be committed to Congress. *Abbasi*, 137 S. Ct. at 1857-58; *Hernandez III*, 140 S. Ct. at 743. Among the special factors courts have relied upon are "the existence of an alternative remedial structure," which "may by itself 'limit the power of the Judiciary to infer a new *Bivens* cause of action,'" *Bistrian II*, 912 F.3d at 90 (quoting *Abbasi*, 137 S. Ct. at 1857-58); and whether implying a *Bivens* remedy would intrude on "national security decisions, insofar as they relate to foreign relations and the military." *Vanderklok II*, 868 F.3d at 206-07. Other special factors may include "the potential cost to the government of recognizing a private cause of action, both financially and administratively; whether the judiciary is well suited to weigh those costs; the necessity to deter future violations; . . . whether a claim addresses individual conduct or a broader policy question; [and] whether litigation would intrude on the function of other branches of government. . . ." *Bistrian II*, 912 F.3d at 90 (citing *Abbasi*, 137 S. Ct. at 1856-63). If there are special factors counseling hesitation, "a *Bivens* remedy will not be available." *Abbasi*, 137 S. Ct. at 1857. The Supreme Court's decisions in *Abbasi*, *Hernandez III*, and the cases preceding them make clear that lower

courts must exercise caution and restraint before permitting claims that present even a modest extension of *Bivens*.

Notwithstanding the Supreme Court's clear antipathy toward extension of *Bivens* to any new contexts, it noted in *Abbasi* that it was not overruling or abrogating *Bivens*, at least not in its original context, stating:

> [I]t must be understood that this opinion is not intended to cast doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.

*Abbasi*, 137 S. Ct. at 1856-57; *see also Jacobs*, 915 F.3d at 1037 ("[*Abbasi*] is not about restricting the core of *Bivens*; it continues the Supreme Court's trend of cautioning against expanding its outer reaches."); *cf. Bistrian II*, 912 F.3d at 91 (noting that the Third Circuit and Supreme Court had previously ratified "failure to protect" claims under the Fifth and Eighth Amendments and "declin[ing] to 'conclude [that the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent.'" (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997), and citing *Farmer v. Brennan*, 511 U.S. 825, 832-49 (1994))); *but see Hernandez III*, 140 S. Ct. at 752-53 ("We have cabined the [*Bivens*] doctrine's scope, undermined its foundation, and limited its precedential value. It is time to correct this Court's error and abandon the doctrine altogether.") (Thomas, J., concurring).

As other courts and commentators have observed, the Supreme Court's most recent *Bivens* decisions have muddied the water for lower courts tasked with assessing the viability of such claims, resulting in inconsistent decisions that are difficult to reconcile in a reasoned way. *See*, *e.g.*, *Graber v. Dales*, 2019 WL 4805241, at *2-6 (noting that the current *Bivens* analysis is "perplexing"); *Boudette v. Sanders*, No. 18-2420, 2019 WL 3935168, at *5, 7 n.5 (D. Colo. Aug.

19, 2019) (opining that the Supreme Court has effectively, but not explicitly, repudiated *Bivens*).[15]

### 3. Post-*Abbasi* Analysis of *Bivens* Claims

Since the issuance of *Abbasi*, a clear majority of circuit and district courts have displayed the caution and restraint noted above, declining to recognize claims that present any extension of *Bivens* and implicate any factors counseling hesitation.  We begin with post-*Abbasi Bivens* decisions of the Third Circuit Court of Appeals, by which we are bound.  Beyond those, and because Xi's *Bivens* claims allege violations of his Fourth and Fifth Amendment rights, we focus primarily on the post-*Abbasi* decisions of other circuit and district courts involving those constitutional provisions.

---

[15] While recognizing that the Supreme Court has not yet expressly overruled or abrogated *Bivens*, or confined it to its facts, the court in *Boudette* candidly noted:

> Commentators have observed that the Court's "stark disavowals bear the hallmarks of repudiation.  But rather than directly prohibiting lower courts from applying *Bivens* in previously unrecognized contexts, the . . . Court adopted a test that achieves a virtually identical result."

*Boudette*, 2019 WL 3935168, at *5 (quoting Daniel B. Rice & Jack Boeglin, *Confining Cases to Their Facts*, 105 Va. L. Rev. 865, 883 (2019)).  Although the *Boudette* court concluded that it was bound to follow *Abbasi*, it further stated:

> The Court agrees with commentators who have stated that "[i]f the [Supreme] Court wants to continue distinguishing *Bivens*, for the sake of judicial candor and litigative efficiency it should hold that the *Bivens* cause of action is limited to the facts of *Bivens*, *Davis*, and *Carlson*."  The Court abstains from commenting further on the merits of the [*Abbasi*] test apart from offering the following quote from *The Charge of the Light Brigade* by Tennyson:  "Was there a man dismayed?  Not though the soldier knew Someone had blundered.  Theirs not to make reply, Theirs not to reason why, Theirs but to do and die.  Into the valley of Death Rode the six hundred."

*Boudette*, 2019 WL 3935168, at *7 n.5 (quoting *Constitutional Remedies—Bivens Actions—Ziglar v. Abbasi*, 131 Harv. L. Rev. 313 (2017)).

(a)      Recent Third Circuit Decisions

The Third Circuit's decision in *Vanderklok II* involved claims by an airline passenger that Transportation Security Administration ("TSA") agents violated his constitutional rights when they inspected his bags, detained him, and ultimately caused him to be charged with disorderly conduct and threatening placement of a bomb.  868 F.3d at 194-95.  Vanderklok was tried and acquitted in the Court of Common Pleas of Philadelphia County.  Thereafter, he filed an action in this District that included *Bivens* claims against a supervisory TSA agent for unconstitutional search and seizure under the Fourth Amendment and retaliatory prosecution under the First Amendment.  *Id.* at 195.  The district court denied the agent's motion for summary judgment on the retaliation claim after surveying then-prevailing law, concluding that "the Supreme Court of the United States, Third Circuit Court of Appeals, other circuit courts[,] and our court have all operated on the assumption" that such a claim can be asserted pursuant to *Bivens*.[16]  *Vanderklok v. United States*, No. 15-370, 2016 WL 4366976, at *3-6 (E.D. Pa. Aug. 16, 2016) (*"Vanderklok I"*), *rev'd in part, appeal dismissed in part by Vanderklok II*, 868 F.3d at 194.

On appeal, the Third Circuit held that "*Bivens* does not afford a remedy against airport security screeners who allegedly retaliate against a traveler who exercises First Amendment rights."  *Vanderklok II*, 868 F.3d at 199.  In so holding, the Court noted the *Abbasi* Court's admonition that "[t]he recognition of a cause of action is context specific."  *Id.* (citing *Abbasi*, 137 S. Ct. at 1860).  Thus, "[i]t is not enough . . . that First Amendment retaliation claims have been permitted under *Bivens* before.  We must look at the issue anew in this particular context,

---

[16] The District Court also denied the TSA agent qualified immunity with respect to the First Amendment claim, and the agent sought an immediate appeal.  *Vanderklok II*, 868 F.3d at 196-97.  The District Court granted the TSA agent's motion for partial summary judgment on the Fourth Amendment search and seizure claim because plaintiff did not oppose the motion on that claim.  *Id.* at 196 n.6.

airport security, and as it pertains to this particular category of defendants, TSA screeners." *Id.*
at 199-200 (citing *Malesko*, 534 U.S. at 68). The Court declined to recognize a *Bivens* claim in
that context, finding that there were dispositive special factors counseling hesitation. *Id.* at 206.
The Court reached this conclusion even though "it [was] possible that no alternative remedy
exist[ed] for Vanderklok, . . . because, 'even in the absence of an alternative, a *Bivens* remedy is
a subject of judgment.'" *Id.* at 205 (quoting *Wilkie*, 551 U.S. at 550); *see also Meshal v.
Higgenbotham*, 804 F.3d 417, 425 (D.C. Cir. 2015) (declining to imply *Bivens* remedy even
where plaintiff had no alternative remedy). Among the special factors the Court identified was
the fact that Vanderklok's claims "[could] be seen as implicating 'the Government's whole
response to the September 11 attacks, thus . . . requiring an inquiry into sensitive issues of
national security.'" *Vanderklok II*, 868 F.3d at 206 (quoting *Abbasi*, 137 S. Ct. at 1861).

Subsequently, the Third Circuit recognized one of three putative *Bivens* claims against
various prison officials asserted by a detainee arising from a brutal beating he sustained at the
hands of other prisoners and from his allegedly punitive placement in a segregated housing unit
("SHU").[17] *Bistrian II*, 912 F.3d at 83-85. The putative *Bivens* claims at issue in that case were:
(1) a Fifth Amendment failure-to-protect claim; (2) a Fifth Amendment punitive detention claim;
and (3) a First Amendment retaliation claim. *Id.* at 85-87.

Applying the *Abbasi* framework to these claims, the Third Circuit held that the Fifth
Amendment failure-to-protect claim did not present a new *Bivens* context, noting that the
Supreme Court had previously "ratified" such a claim under the Eighth Amendment. *Id.* at 90

---

[17] The plaintiff, Bistrian, was detained at the Federal Detention Center in Philadelphia for
more than two years while he awaited trial and through his trial, conviction, and sentencing.
*Bistrian II*, 912 F.3d at 83. During that time, Bistrian was placed in the SHU four times, the last
of which was after he objected to his treatment in prison and confinement in the SHU. *Id.* at 83-
85.

(citing *Farmer*, 511 U.S. at 832-49).  The Court reasoned that although Bistrian's claim arose

under a different constitutional provision—the Fifth Amendment—the context did not differ

meaningfully from the claim at issue in *Farmer*.  *Id.* at 91 n.19 (noting that "[t]he Fifth

Amendment protects pretrial detainees, while the Eighth Amendment protects post-trial

convicts" (citing *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993))).  Having found that the

failure-to-protect claim did not extend *Bivens*, the Court noted that a special factors analysis was

unnecessary, but nonetheless stated:

> Even if there were such a need, however, the factors the defendants point to—
> namely, first, the existence of alternative remedial structures, second, the
> implication of the passage of the [Prison Litigation Reform Act], and third,
> separation of powers principles—are unpersuasive, given the weight and clarity of
> relevant Supreme Court precedent.

*Id.* at 92.

Turning to the Fifth Amendment punitive detention and First Amendment retaliation

claims, the Court held that both would extend *Bivens* into new contexts, and special factors

counseled against recognition of either claim.  *Id.* at 94-96 (observing that previous Supreme

Court cases had not addressed a constitutional right against punitive detention, and "[t]he

Supreme Court has never recognized a *Bivens* remedy under the First Amendment").  The Court

held that the special factors implicated by these claims included separation of powers concerns,

intrusion into executive policies, and the likely imposition of "a large burden to both the

judiciary and prison officials."  *Id.* at 94-96.

(b)     Post-*Abbasi* Decisions of Other Courts

In several decisions, other circuit courts have found contextual differences—and special

factors counseling hesitation—in putative *Bivens* claims under the Fourth and Fifth

Amendments, even where the circumstances of those claims bore some similarity to previously

recognized *Bivens* claims.  *See Cantú v. Moody*, 933 F.3d 414, 421-24 (5th Cir. 2019) (declining

to recognize Fourth Amendment *Bivens* claim by acquitted defendant alleging that FBI agents fabricated evidence, falsified affidavits, and induced prosecutors to charge him without any basis), *cert denied*, 141 S. Ct. 112 (2020); *Farah v. Wyker*, 926 F.3d 492, 496 (8th Cir. 2019) (holding that there is no implied Fourth Amendment cause of action under *Bivens* against a federal law enforcement officer who allegedly "lies, manipulates witnesses, and falsifies evidence"); *Attkisson v. Holder*, 925 F.3d 606, 621-22 (4th Cir. 2019) (affirming dismissal of investigative reporter's Fourth Amendment *Bivens* claim alleging unlawful surveillance of electronic devices); *Tun-Cos v. Perrotte*, 922 F.3d 514, 523-28 (4th Cir. 2019) (declining to recognize Fourth and Fifth Amendment *Bivens* claims for Immigration and Customs Enforcement agents' alleged unconstitutional search and seizure and ethnic discrimination), *cert. denied*, No. 19-661, 2020 WL 1496627 (U.S. Mar. 30, 2020); *Brunoehler v. Tarwater*, 743 F. App'x 740,742-43 (9th Cir. 2018) (holding that arrestee's Fourth Amendment claim against FBI agents for unlawful wiretapping was an extension of *Bivens* and was precluded by the existence of an alternative remedial structure)[18]; *Hernandez II*, 885 F.3d at 816-18, 823 (holding that Fourth and Fifth Amendment claims against border patrol agent for cross-border shooting implicated new *Bivens* contexts, and special factors prohibited recognition of the claims), *aff'd by Hernandez III*, 140 S. Ct. 735; *see also Meshal*, 804 F.3d at 423-29 (holding, pre-*Abbasi*, that an American citizen's claim that federal officials violated his Fourth and Fifth Amendment rights while he was detained in other countries in connection with a terrorism investigation presented a

---

[18] As noted below, however, the court in *Brunoehler* held that the plaintiff's Fourth Amendment claim that FBI agents searched and arrested him without probable cause did not seek an extension of *Bivens*. *Brunoehler*, 743 F. App'x at 743-44 (concluding that arrestee's "unlawful search and arrest claims [were] not meaningfully different from *Bivens*, which involved the same claims—albeit for different crimes—in virtually the same search-and-seizure context." (internal quotation marks omitted)).

new *Bivens* context as to which special factors counseled hesitation), *cert. denied*, 137 S. Ct. 2325 (2017).[19]

District courts in this circuit and elsewhere have similarly declined to recognize putative *Bivens* claims alleging Fourth Amendment violations.  *See Butler v. Hesch*, No. 16-1540, 2020 WL 1332476, at *12 (N.D.N.Y Mar. 23, 2020) (holding that claim of malicious prosecution against agents of U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives involved "different conduct by different officers from a different federal agency" and, as such, "cannot be shoehorned into *Bivens*, *Davis*, or *Carlson*"); *Boudette*, 2019 WL 3935168, at *7 (holding that under the *Abbasi* test, a defendant against whom criminal charges were dismissed could not pursue a Fourth Amendment malicious prosecution claim against DEA agent); *Karkalas v. Marks*, No. 19-948, 2019 WL 3492232, at *6-14 (E.D. Pa. July 31, 2019) (declining to imply Fourth Amendment *Bivens* cause of action against prosecutor and DEA diversionary agent for "unlawful prosecution and pretrial detention following allegedly false and misleading statements to a grand jury"), *affirmed on other grounds*, No. 19-2816, 2021 WL 508060 (3d Cir. Feb. 11, 2021); *Lane v. Schade*, No. 15-1568, 2018 WL 4571672, at *6-7 (D.N.J. Sept. 24, 2018) (declining to recognize a *Bivens* remedy for malicious abuse of process and malicious prosecution).

However, there is not judicial unanimity regarding the post-*Abbasi* contextual boundaries of cognizable *Bivens* claims, or regarding what factors should counsel hesitation in particular

---

[19] The court in *Meshal* found it unnecessary to "decide, categorically, whether a *Bivens* action can lie against federal law enforcement officials conducting non-terrorism criminal investigations against American citizens abroad," or "whether a *Bivens* action is available for plaintiffs claiming wrongdoing committed by federal law enforcement officers during a terrorism investigation occurring within the United States."  804 F.3d at 422.

contexts.  *See Jacobs*, 915 F.3d at 1035, 1038-39 (holding that plaintiff, who was shot in a

confrontation with deputized U.S. Marshals and was later acquitted of all charges resulting from

the confrontation, could pursue *Bivens* claims for excessive force, fabrication of evidence, false

arrest, and civil conspiracy); *Bistrian II*, 912 F.3d at 90-91 (holding that detainee's Fifth

Amendment failure-to-protect claim did not present a new *Bivens* context where similar claim

had previously been recognized under Eighth Amendment); *Lanuza v. Love*, 899 F.3d 1019,

1028-1034 (9th Cir. 2018) (holding that alien's Fifth Amendment due process claim alleging

falsification of evidence by immigration prosecutor presented a new *Bivens* context but did not

implicate any special factors articulated in *Abbasi*); *Rodriguez v. Swartz*, 899 F.3d 719, 738-48

(9th Cir. 2018) (holding that no special factors precluded recognition of Fourth Amendment

*Bivens* claim against border patrol agent for cross-border shooting), *cert. granted, judgment

vacated*, 140 S. Ct. 1258 (2020) (remanding for further consideration in light of *Hernandez III*);

*Brunoehler*, 743 F. App'x at 743-44 (concluding that arrestee's "unlawful search and arrest

claims [were] not meaningfully different from *Bivens*, which involved the same claims—albeit

for different crimes—in virtually the same search-and-seizure context") (internal quotation

marks omitted); *see also Prado v. ICE Agent Perez*, 451 F. Supp. 3d 306, 316 (S.D.N.Y. 2020)

(finding that unlawful search and arrest claims against Immigrations and Customs Enforcement

("ICE") agents did not present a new *Bivens* context or implicate special factors counseling

hesitation and noting that "[r]ights without remedies are cold comfort"); *Gonzalez v. John Doe

#1 et al.*, No. 18-2254, 2020 WL 1244403, at *5-7 (M.D. Pa. Mar. 16, 2020) (declining to

dismiss *Bivens* claims against immigration officials for alleged false imprisonment and use of

excessive force); *Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 708 (S.D.N.Y. 2020) (declining

to dismiss *Bivens* excessive force claim, noting that the case involved a "run-of-the mill

challenge to standard law enforcement operation" and that "special factors would not counsel

against extending a *Bivens* remedy"); *Greiner v. Wall*, No. 14-5579, 2020 WL 996860, at * 1, 3

(W.D. Wash. Mar. 2, 2020) (noting "evolving standards" under *Bivens* and holding that allegedly

improper execution of search warrant "hits the sweet spot of Fourth Amendment search and

seizure principles that enforce the training of every law enforcement officer in America");

*Elhady v. Pew*, 370 F. Supp. 3d 757, 770-71 (E.D. Mich. 2019) (finding that detainee's Fifth

Amendment conditions of confinement claim against Customs and Border Patrol officials

presented a new *Bivens* context but did not implicate national security concerns or other special

factors); *Linlor v. Polson*, 263 F. Supp. 3d 613, 620-25 (E.D. Va. 2017) (holding that although

Fourth Amendment excessive force claim against airport screener presented new *Bivens* context,

claim was not precluded by alleged alternative remedial processes or by "vague generalizations

about the importance of national security").

Courts finding that the claims before them did not extend *Bivens* have reasoned that

*Abbasi* "does not require that there be perfect factual symmetry between a proffered *Bivens* claim

and *Bivens* itself."  *Brunoehler*, 743 F. App'x at 744.  Rather, they have noted that the *Abbasi*

Court "explicitly preserved 'the continued force, or even the necessity, of *Bivens* in the search-

and-seizure context in which it arose.'"  *Id.* (quoting *Abbasi*, 137 S. Ct. at 1856); *see also*

*Jacobs*, 915 F.3d at 1038 ("[*Abbasi*] and *Hernandez* [*II*] are not the silver bullets defendants

claim them to be—plaintiff's claims are run-of-the-mill challenges to standard law enforcement

operations that fall well within *Bivens* itself."); *see also Bistrian II*, 912 F.3d at 90 ("[A]n

inmate's claim that prison officials violated his Fifth Amendment rights by failing to protect him

against a known risk of substantial harm does not present a new *Bivens* context."); *Prado*, 2020

WL 1659848, at *5 ("*Bivens* actions have been sustained against federal law enforcement

officers beyond FBI agents, including ICE agents"); *Gonzalez*, 2020 WL 1244403, at *7

(declining to dismiss claims of excessive force and false imprisonment "to the extent that . . .

[defendants] claim plaintiff's causes of action cannot be brought because they are an improper

expansion of liability under *Bivens*"); *Bueno Diaz*, 2020 WL 1082482, at *5 (holding that

allegedly unconstitutional arrest in New York City "is not so far afield" from recognized *Bivens*

contexts); *Graber v. Dales*, No. 18-3168, 2019 WL 4805241, at *2-6 (E.D. Pa. Sept. 30, 2019)

(concluding that individual arrested and charged following protest at Democratic National

Convention could pursue Fourth Amendment *Bivens* claim against Secret Service agent).[20]

 Courts permitting extension of *Bivens* to new contexts alleged by the government to

implicate national security or foreign policy have similarly relied upon the *Abbasi* court's

statement that:

> [N]ational-security concerns must not become a talisman used to ward off
> inconvenient claims—a label used to cover a multitude of sins.  This danger of
> abuse is even more heightened given the difficulty of defining the security interest
> in domestic cases.

*Abbasi*, 137 S. Ct. at 1862; *see also Lanuza*, 899 F.3d at 1030 ("[B]ecause this case relates only

to routine immigration proceedings, expanding *Bivens* to this context does not threaten the

political branches' supervision of national security and foreign policy."); *Rodriguez*, 899 F.3d at

---

[20] In *Graber*, the court observed that that determining whether plaintiff's Fourth
Amendment claim involved a new *Bivens* context "is a *perplexing question* after *Abbasi*."  2019
WL 4805241, at *3 (emphasis added).  The court noted that the issue of whether differences
between the *Graber* case and *Bivens* were meaningful was "a close call," and explained:
> On one hand, Plaintiff's claims seem to challenge precisely the kind of core, run-
> of-the-mill Fourth Amendment activity for which a *Bivens* cause of action has
> always been thought to be available—the seizure of a person without probable
> cause by a federal agent, just as in *Bivens* itself.  On the other hand, *Abbasi* made
> clear that even relatively trivial factual differences might make a context new.

*Id.* at *3-4.  The contextual analysis in Xi's case is similarly perplexing, although we ultimately
conclude that the differences between Xi's claims and the recognized *Bivens* contexts are
meaningful.

745-46 (holding that *Bivens* claim for cross-border shooting would not harm national security or foreign policy); *Graber*, 2019 WL 4805241, at *4 (holding that Fourth Amendment claims against Secret Service agent "do not implicate government policy at all; rather, Plaintiff is merely challenging the constitutionality of a one-off arrest"); *Elhady*, 370 F. Supp. 3d at 771 ("[T]here is no plausible national-security interest in placing a person in a room so cold that he develops hypothermia within a matter of hours."); *Linlor*, 263 F. Supp. 3d at 623 ("The question is not whether airports present special security concerns—they do—but whether those concerns have any particular bearing on the context at issue in this case.").

The contextual analysis in this case is also perplexing, although we ultimately conclude that the differences between Xi's claims and the recognized *Bivens* contexts are meaningful.

### 4.    Analysis of Xi's <u>Bivens</u> Claims

As is evident from the case law surveyed above, determining whether claims present new *Bivens* contexts and, if they do, whether any special factors counsel hesitation, requires a case- and fact-specific analysis.  In this case, the dictates of *Abbasi* and the preceding Supreme Court decisions, and the weight of authority discussed above, compel us to conclude that Xi's *Bivens* claims present new contexts and implicate special factors requiring dismissal of those claims.

### (a)    <u>Xi's Fourth Amendment Claims (Counts I, III)</u>

As a threshold matter, we address the constitutional provision implicated by Xi's claim of malicious prosecution/fabrication of evidence (Count I).  Xi asserts this claim under both the Fourth Amendment and the Fifth Amendment Due Process Clause.  However, this claim is fundamentally founded on allegations that Xi was deprived of pretrial liberty without probable cause.  Therefore, it is only the Fourth Amendment that is implicated by Count I.  *See Manuel v. City of Joliet, Ill.* (*"Manuel I"*), 137 S. Ct. 911, 919 (2017) ("If the complaint is that a form of

legal process resulted in pretrial detention unsupported by probable cause, then the right

allegedly infringed lies in the Fourth Amendment.")[21]; *Geness v. Cox*, 902 F.3d 344, 354 n.5 (3d

Cir. 2018) (observing that a claim for reckless investigation under the Due Process Clause, "if

cognizable, could only arise under the Fourth Amendment" (citing *Manuel I*, 137 S. Ct. at 919)).

   As detailed above, Xi alleges that Haugen intentionally, knowingly and/or recklessly

made false statements and material omissions of fact to initiate the prosecution of Xi and cause

his arrest and the searches of his home and office, both of which were allegedly unsupported by

probable cause.  Xi alleges that as a result, he suffered a deprivation of liberty and the unlawful

search and seizure of his person and property.  Xi contends that his Fourth and Fifth Amendment

claims do not extend *Bivens* into new contexts.  Rather, he argues, they are "quintessential civil

rights claims" that "fall within the heartland of *Bivens*," and "are exactly the type of flagrant

constitutional violations *Bivens* is intended to remedy and deter."  (Pls.' Cons. Opp. 10-11.)

Under *Abbasi*, and the weight of relevant authority, we are compelled to disagree.

   Although Xi's Fourth Amendment claims bear some similarity to those in *Bivens* itself,

the context of Xi's claims differs from *Bivens* in meaningful ways.  *Abbasi*, 137 S. Ct at 1859

(explaining that if a case differs "in a meaningful way from previous *Bivens* cases decided by

---

[21] In *Manuel I*, the Supreme Court explained the "constitutional division of labor" between the Fourth Amendment and the Fifth and Fourteenth Amendments as follows:

> [I]f the [legal] proceeding is tainted—as here, by fabricated evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights, . . . By contrast[,] . . . once a trial has occurred, the Fourth Amendment drops out:  A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment.

*Manuel I*, 137 S. Ct. at 920 n.8; *see also Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019) (explaining that constitutional "claims for wrongful pretrial detention—whether based on fabricated evidence or some other defect—sound in the Fourth Amendment." (citing *Manuel v. City of Joliet* ("*Manuel II*"), 903 F.3d 667, 670 (7th Cir. 2018))).

this Court, then the context is new").  To illustrate those differences, we begin with the Supreme

Court's description of the claims in *Bivens*:

> This case has its origin in an arrest and search carried out on the morning of
> November 26, 1965.  Petitioner's complaint alleged that on that day respondents,
> agents of the Federal Bureau of Narcotics acting under claim of federal authority,
> entered his apartment and arrested him for alleged narcotics violations.  The agents
> manacled petitioner in front of his wife and children, and threatened to arrest the
> entire family.  They searched the apartment from stem to stern.  Thereafter,
> petitioner was taken to the federal courthouse in Brooklyn, where he was
> interrogated, booked, and subjected to a visual strip search.
>
> . . . [Petitioner's] complaint asserted that the arrest and search were effected without
> a warrant, and that unreasonable force was employed in making the arrest; fairly
> read, it alleges as well that the arrest was made without probable cause.

*Bivens*, 403 U.S. at 389-90.

At a general level, parallels exist between Xi's Fourth Amendment claims and *Bivens*.

Both involve claims by a private citizen against individual, federal law enforcement agents who

allegedly searched and seized the plaintiff's personal property and deprived him of liberty

without probable cause in connection with a criminal investigation.  However, "treating all

search-and-seizure cases the same would contradict the Supreme Court's direction that a context

can be new even if it involves the same constitutional right as an existing case."  *Farah*, 926 F.3d

at 499 (citing *Abbasi*, 137 S. Ct. at 1859); *see also Cantú*, 933 F.3d at 422 ("Courts do not define

a *Bivens* cause of action at the level of 'the Fourth Amendment' or even at the level of 'the

unreasonable-searches-and-seizures clause.'"  (quoting *FDIC v. Meyer*, 510 U.S. 471, 484 n.9

(1994))).  Instead, under the governing framework, "'even a modest extension is still an

extension,' and even if the differences are 'perhaps small, at least in practical terms,' the 'new

context inquiry is easily satisfied.'  In addition, the context may be different '[e]ven though the

right and the mechanism of injury [are] the same. . . .'  Thus, a single meaningful difference in

'almost parallel circumstances'" will render a context new under *Abbasi*.  *Boudette*, 2019 WL

3935168, at *6 (quoting *Abbasi*, 137 S. Ct. at 1864, 1865, 1860 (internal citations omitted)).

Analyzed through a post-*Abbasi* lens, Xi's Fourth Amendment claims represent an extension of

*Bivens*, if arguably a modest one.

      First, and in contrast to *Bivens*, Xi's claims do not involve a warrantless search and

seizure.  *See Cantú*, 933 F.3d at 423 (noting that "plaintiff [did] not allege the officers entered his

home without a warrant or violated his rights of privacy").  Xi does not dispute that he was

indicted by a grand jury, and that the searches and seizures of his person and property were

effected pursuant to warrants.  Instead, Xi alleges that Haugen maliciously initiated Xi's

prosecution and caused the search and seizure of his property without probable cause and based

on knowing or reckless "false statements and representations and material omissions of facts in

his reports, affidavits and other communications with federal prosecutions."  (SAC ¶ 54; *see also*

*id.* ¶ 67 (alleging knowing or reckless "false statements and representations and material

omissions of facts" in search warrant affidavit).)  These kinds of "information-gathering and

case-building activities are a different part of police work than the apprehension, detention, and

physical searches at issue in *Bivens*."  *Farah*, 926 F.3d at 499; *see also Cantú*, 933 F.3d at 423

(holding that officers' alleged falsification of affidavits differed from conduct at issue in *Bivens*);

*Boudette*, 2019 WL 3935168, at *7 (contrasting agents' alleged evidence tampering with conduct

in *Bivens*).

      Second, as the court in *Farah* reasoned, "the mechanism of injury is different" from

*Bivens*, in which the plaintiff's injuries "were directly caused by the officers' conduct."  *Id.*  As

in *Farah*, Haugen's alleged wrongdoing injured Xi "through a series of intervening steps . . .

involv[ing] decisions by independent legal actors"—here, the prosecutors who chose to pursue

charges against Xi, the grand jury that indicted him, and the judicial authorities who approved

the searches and seizures at issue.  *Id.*  "This indirect mechanism of injury bears little

resemblance to the straightforward claims from *Bivens*."  *Id.*

Third, Xi's claims differ from *Bivens* in the risk they pose of "disruptive intrusion by the

Judiciary into the functioning of other branches."  *Abbasi*, 137 S. Ct. at 1860.  "Probing the

causal chain" in a case like this "would involve delving into the evidence before numerous

decisionmakers," including prosecutors and the grand jury.  *Farah*, 926 F.3d at 499; *see also*

*Boudette*, 2019 WL 3935168, at *7 (reasoning that plaintiff's malicious prosecution claim would

"require[] an inquiry into the decision making of prosecutors and into the veracity of allegations

underlying a prosecutor's decision to charge a defendant with a crime"); *Karkalas*, 2019 WL

3492232, at *9, n.108 (noting that claims of unlawful prosecution and detention following

allegedly false and misleading statements to grand jury would "necessitate[] an inquiry into the

grand jury proceedings" (citing *Farah*, 926 F.3d at 499)).

Moreover, as Haugen notes, Xi's allegations implicate "the investigation (which

allegedly included both warrantless and court-ordered foreign intelligence surveillance), arrest,

and prosecution of a scientist for allegedly spying on behalf of a foreign power by transferring to

it sensitive United States technologies."  (Haugen Mot. 11.)  We acknowledge Xi's argument

that his *Bivens* claims do not explicitly "challenge the FBI's policies" or its broader

counterespionage efforts but, rather, allege specific misconduct by an individual agent.  (Pls.'

Cons. Opp. 15.)  And it is true that Xi is no longer asserting *Bivens* claims against Haugen with

respect to his role in the FISA orders or warrantless surveillance.  However, the SAC includes

extensive background allegations regarding the government's use of FISA, Section 702, and EO

12,333 in the investigation, and regarding Haugen's role therein.[22]  For example, the SAC

alleges, *inter alia*, that:

- Haugen's deliberate and/or reckless falsifications and withholding of exculpatory evidence caused the issuance of orders under FISA, (SAC ¶ 59);

- Although neither Section 702 nor [EO 12,333] permits the government to "target" Americans directly, the FBI and NSA nonetheless frequently rely on these authorities to obtain without a warrant the communications of Americans who are in contact with individuals abroad—as Professor Xi was with his family and in the course of his scientific and academic work—in violation of the Fourth Amendment, (*Id.* ¶ 60);

- According to press reports, the government, acting through the NSA, has engaged in extensive and concerted warrantless surveillance of Chinese universities and scientific research institutions . . . For example, the government has obtained certifications under Section 702 that specifically authorize warrantless surveillance related to the Chinese government and its components, (*Id.* ¶ 61);

- Haugen . . . searched law enforcement and investigative databases for communications of Professor Xi that the government had intercepted without a warrant—including his private communications intercepted under Section 702 of FISA and/or Executive Order 12333—and examined, retained, and/or used such communications. . . . These database searches are so common in FBI investigations that the government has referred to them as the "FBI's Google." They are designed to identify and exploit the communications of Americans that the government has intercepted without a warrant, (*Id.* ¶ 64);

- Haugen . . . relied on information obtained or derived from warrantless surveillance, including Professor Xi's private communications intercepted under Section 702 of FISA and/or [EO 12,333], in affidavits, applications, and other materials submitted in support of FISA orders and search warrants targeting Professor Xi, (*Id.* ¶ 65); and

- Over a period of 10 months, from 2014-2015, at least three federal criminal indictments of Chinese-American scientists were dismissed prior to any trial. This includes dismissal of the cases against Professor Xi (case dismissed in September 2015), Sherry Chen, a hydrologist with the U.S. National Weather Service in Ohio (case dismissed in March 2015), and Guoqing Cao and Shuyu

---

[22] As noted above, Xi's original Complaint and FAC included Fourth Amendment *Bivens* claims based on the warrantless surveillance and FISA orders.  We assume that Xi omitted those claims in the SAC to buttress his argument that his claims would not extend *Bivens*.

> Li, senior biologists at Eli Lilly & Company (cases dismissed in December 2014), (*Id.* ¶ 68).

In addition, Count X of the SAC specifically challenges the government's alleged interception, seizure, and retention of Plaintiff's property and communications in violation of the Fourth Amendment.  Thus, unlike the Fourth Amendment claim in *Graber*, "this is [not] a 'straightforward case against a single low-level federal officer.'"  *Graber*, 2019 WL 4805241, at *4 (quoting *Lanuza*, 899 F.3d at 1029).  Although Xi attempts to frame his claims as such, their context is meaningfully different from *Bivens*, which "involved an investigation into seemingly local conduct." *Cantú*, 933 F.3d at 424.  In contrast, Xi's claims involve an investigation conducted pursuant to an executive branch, multi-agency effort to prevent international economic espionage. *Id.*  Accordingly, we are compelled to conclude that adjudication of Xi's claims would pose a risk of disruptive judicial intrusion into that effort.[23]

---

[23] Xi argues that "under Haugen's extreme position, even a case with facts virtually identical to *Bivens* itself would present such an unwarranted intrusion by challenging the federal government's anti-narcotics efforts."  (Pls.' Cons. Opp. 16; *see also id.* ("Furthermore, if the potential involvement of classified information rendered the context 'new,' that could immunize wide swaths of law enforcement violations of Fourth and Fifth Amendment rights."))

Xi's observations are not unfounded. *See Boudette*, 2019 WL 3935168, at *7 ("[T]he Supreme Court's decision in [*Abbasi*] is 'close to limiting the *Bivens* cause of action to the circumstances of *Bivens*, *Davis*, and *Carlson*, as it will be very difficult for any case not presenting those facts to survive the [*Abbasi*] test.'" (quoting *Constitutional Remedies*, 131 Harv. L. Rev. at 318)).  However, if Xi or other plaintiffs wish to return to the *Bivens* analysis of an earlier time, or to alter the current *Abbasi* analytical framework, they must look to the Supreme Court or, ultimately, Congress. *See Abbasi*, 137 S. Ct. at 1857 ("When a party seeks to assert an implied cause of action under the Constitution itself, . . . separation-of-powers principles are or should be central to the analysis.  The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts?  The answer most often will be Congress." (quoting *Bush*, 462 U.S. at 380) (internal citation omitted)); *see also Cantú*, 933 F.3d at 424 (distinguishing *Bivens* and noting that if plaintiff "want[s] a damages suit—including potentially burdensome discovery—regarding complicated investigations such as this one, that request must be made to Congress not the courts" (citing *Abbasi*, 137 S. Ct. at 1860-61)).

(b)     Fifth Amendment Due Process/Equal Protection Claim (Count II)

Xi's Fifth Amendment claim alleges that "Haugen's investigation and initiation of prosecution against . . . Xi were based on impermissible racial and ethnic factors" and, thus, Haugen's actions violated Xi's clearly established due process and equal protection rights.  (SAC ¶¶ 101-02.)  The context of this claim is meaningfully different from *Bivens*, *Davis*, and *Carlson*, "the only instances in which the [Supreme] Court has approved of an implied damages remedy under the Constitution itself."  *Abbasi*, 137 S. Ct. at 1854-55.

Xi's Fifth Amendment claim clearly differs from the Fourth Amendment search-and-seizure claim in *Bivens* and the Eighth Amendment failure-to-treat claim in *Carlson*, and Xi does not contend otherwise.  Instead, Xi argues that his claim presents the same context as *Davis*, in which the Supreme Court implied a damages remedy for "unlawful discrimination in violation of the Due Process Clause of the Fifth Amendment."  (Pls.' Cons. Opp. 11.)  The due process claim recognized in *Davis*, however, involved federal workplace gender discrimination.  *Davis*, 442 U.S. at 247-48.  In contrast, Xi's claim alleges racial and ethnic discrimination against an investigative target by a federal law enforcement officer specifically assigned to Chinese counterintelligence.  Xi's claim unquestionably would "extend *Bivens* [and *Davis*] to [a] new context [and a] new category of defendants."  *Abbasi*, 137 S. Ct. at 1857; *see also Tun-Cos*, 922 F.3d at 525 (holding that plaintiff's Fifth Amendment claims of ethnic discrimination "have no analogue in the Supreme Court's prior *Bivens* cases"); *Schwarz v. Meinberg*, 761 F. App'x 732, 734 (9th Cir. 2019) (holding that Fifth Amendment claim alleging national origin discrimination arose in a different context than *Davis*), *cert. denied*, No. 19-5776, 2019 WL 5686563 (U.S. Nov. 4, 2019); *Doe v. Meron*, 929 F.3d 153, 169 (4th Cir. 2019) (holding that plaintiff's Fifth Amendment claims alleging "violations of his right to parentage, to familial relations and to

equal protection of the laws" differed significantly from the *Bivens* claim recognized in *Davis*);

*Cole v. Fed. Bureau of Investigation*, *Salt Lake City, Utah Office*, No. 09-21, 2019 WL 1102569,

at *4 (D. Mont. Feb. 7, 2019) (holding that Fifth Amendment claim against FBI and agent for

racially discriminatory police practices presented new *Bivens* context), *report and*

*recommendation adopted*, 2019 WL 1100507 (D. Mont. Mar. 7, 2019).  Xi's claim also involves

a different mechanism of injury than *Davis*, in which the plaintiff's injury resulted directly from

the individual discriminatory attitude and actions of her employer.  *See Farah*, 926 F.3d at 499.

Finally, Xi's equal protection claim is contextually different because it essentially

challenges executive branch policies regarding the detection and prevention of economic

espionage by China.  Xi alleges that Haugen's actions "were based on impermissible racial and

ethnic factors, and specifically on Professor Xi's Chinese ethnicity, his former status as a

Chinese national, and the fact that his communications were with Chinese entities." (SAC ¶ 102;

*see also id.* ¶¶ 69, 70.)  However, Xi does not allege that Haugen harbored any personal animus

or bias against the Chinese.  On the contrary, Xi's allegations acknowledge that Haugen acted

"[a]s a Special Agent employed by the FBI working on Chinese counterintelligence."  (*Id.* ¶ 69.)

Moreover, the SAC includes several allegations regarding the investigative and surveillance

practices used by the government to conduct Chinese counterintelligence.  (*See id.* ¶ 61 (alleging,

*inter alia*, that "the government, acting through the NSA, has engaged in extensive and concerted

warrantless surveillance of Chinese universities and scientific research institutions").)  Plaintiffs'

allegations reveal that to the extent race and ethnicity were factors in the investigation and

prosecution of Xi, those factors are the product of executive branch counterintelligence policy,

not individual bias on Haugen's part.  This context differs meaningfully from *Davis* and, by its

nature, poses a heightened risk of disruptive judicial intrusion into the functioning of other

branches of government.  *Abbasi*, 137 S. Ct. at 1859-60 (explaining that differences meaningful

enough to make a context new include, *inter alia*, the "legal mandate under which the officer was

operating" and "the risk of disruptive intrusion by the Judiciary into the functioning of other

branches").

(c)     <u>Special Factors Counsel Against Allowing Xi's *Bivens* Claims</u>

Because Xi's claims against Haugen would extend *Bivens* into new contexts, they are not

cognizable if there are any "special factors counselling hesitation in the absence of affirmative

action by Congress." *Id.* at 1857 (internal quotation marks and citation omitted).  In other words,

we may not permit an extension of *Bivens* "if there are sound reasons to think Congress might

doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law

and correcting a wrong[.]" *Id.* at 1858; *see also Hernandez III*, 140 S. Ct. at  749 ("[T]his case

features multiple special factors that counsel hesitation about extending *Bivens*, but they can all

be condensed to one concern—respect for the separation of powers.").  At this step, we must

determine "whether anything about these [claims] 'causes us to pause before acting without

express congressional authorization.'  It does not take much to make us pause, because 'in most

instances, Congress is in the better position to consider if the public interest would be served by

imposing a new substantive legal liability.'" *Farah*, 926 F.3d at 500 (quoting *Abbasi*, 137 S. Ct.

at 1857-58) (alterations in original omitted).  In applying this step of the *Abbasi* test, we note that

the recognized *Bivens* claims involved actions by line-level federal officers who allegedly

violated individual rights based on individual decisions, not government-level policies.  Here, we

are dealing with a larger issue—international counterterrorism efforts driven by multiple, high-

level decision makers, even if those efforts are ultimately implemented by individual agents.  In

this context and given the scope of Xi's claims, the following factors give us pause.

40

First, Xi's *Bivens* claims implicate national security, counterintelligence, and foreign policy concerns.  Xi argues that his *Bivens* claims present only "bread-and-butter" constitutional claims that "Haugen falsified, misrepresented, and fabricated evidence to wrongly accuse [Xi] of being a technological spy for China."  (Pls.' Cons. Opp. 21 (internal quotation omitted).)  These claims, Xi argues, do not involve national security or foreign policy except in the most general sense, and he notes the Supreme Court's admonition that "national-security concerns must not become a talisman to ward off inconvenient claims."  (*Id.* at 18-19 (quoting *Abbasi*, 137 S. Ct. at 1862).)

These concerns are not talismanic in this case, which arguably implicates the government's response to the threat of foreign economic espionage.  All of Haugen's alleged misconduct occurred during his work as an FBI special agent assigned to Chinese counterintelligence.  Determining whether Haugen knowingly or recklessly falsified, misrepresented, or fabricated evidence against Xi would almost certainly require an inquiry into the evidence Haugen obtained and the methods and authority he and other government actors used to obtain and evaluate it.  *See Abbasi*, 137 S. Ct. at 1861 ("Judicial inquiry into the national-security realm raises 'concerns for the separation of powers in trenching on matters committed to the other branches.'" (quoting *Christopher v. Harbury*, 536 U.S. 403, 417 (U.S. 2002))); *see also Hernandez III*, 140 S. Ct at  744-50 (reasoning that allowing a *Bivens* remedy in cross-border shooting context would implicate foreign relations and national security); *Vanderklok*, 868 F.3d at 206-07 (holding that necessity of inquiry into national security counseled hesitation in implying *Bivens* claim); *see also Tun-Cos*, 922 F.3d at 526 (noting that "immigration enforcement . . . has the natural tendency to affect diplomacy, foreign policy, and the security of the nation" (citation and internal quotation omitted)); *Arar v. Ashcroft*, 585 F.3d 559, 575 (2d

Cir. 2009) (*en banc*) ("The Supreme Court has expressly counseled that matters touching upon foreign policy and national security fall within 'an area of executive action in which courts have long been *hesitant* to intrude' absent congressional authorization." (quoting *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)).

Related factors counseling hesitation include the likelihood that such an inquiry could "require [the] court[] to interfere in an intrusive way with sensitive functions of the Executive Branch," *Abbasi*, 137 S. Ct. at 1861, and could involve classified information. *See Arar*, 585 F.3d at 576 (discussing need to examine classified information as a special factor counseling hesitation). As noted above, adjudication of Xi's *Bivens* claims would almost certainly require an intrusive inquiry into the counterintelligence policy, methods, and authority relied upon by the executive branch to combat Chinese economic espionage, and by Haugen specifically in Xi's case. *See Bistrian II*, 912 F.3d at 95 (noting that a judicial ruling on policy matters "would unduly encroach on the executive's domain"). Moreover, at least some aspects of this inquiry could implicate classified information. In this regard, we note that in the criminal case against Xi, court personnel were required to obtain security clearances before they could view sensitive materials related to that case. *See Arar*, 585 F.3d at 577 ("[T]he problems posed by the need to consider classified material are unavoidable in some criminal prosecutions and in other cases where we have a duty, imposed by Congress, to exercise jurisdiction. But this is not such a circumstance or such a case."). The likely need to probe such sensitive information entails at least some risk of exposing—and hampering the effectiveness of—the government's counterintelligence strategies and methods. *See Lebron v. Rumsfeld*, 670 F.3d 540, 554 (4th Cir. 2012) (noting that although courts have methods to seek to protect sensitive information, "even

inadvertent disclosure may jeopardize future acquisition and maintenance of the sources and methods of collecting intelligence"), *cert. denied*, 567 U.S. 906 (2012).

There is an additional basis for hesitation in the principle that "a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'"  *Abbasi*, 137 S. Ct. at 1860 (quoting *Malesko*, 534 U.S. at 74).  Without repeating the discussion above, we note that although Xi characterizes his claims as challenging only Haugen's individual alleged misconduct, his allegations implicate and effectively challenge executive branch investigative and surveillance policies related to Chinese counterintelligence.

Because Xi's claims against Haugen would extend *Bivens*, and because there are special factors counseling hesitation, Xi's claims are not cognizable.  We reach this conclusion despite the apparent absence of a comparable alternative remedy to vindicate Xi's constitutional rights.  *See Hernandez III*, 140 S. Ct. at 750 ("Congress's decision not to provide a judicial remedy does not compel us to step into its shoes."); *see also Vanderklok II*, 868 F.3d at 205 ("Although it is possible that no alternative remedy exists[,] . . . that does not conclude our analysis because, 'even in the absence of an alternative, a *Bivens* remedy is a subject of judgment.'" (quoting *Wilkie*, 551 U.S. at 550)).  Here, Haugen has not argued that any alternative remedies are available to Xi.[24]  Moreover, the alternative remedial structures identified in other cases offer little or no practical redress to Xi.  *See Farah*, 926 F.3d at 492 (discussing remedies available under the Hyde Amendment and 28 U.S.C. §§ 1495, 2255).[25]  Nevertheless, as the Eighth Circuit

---

[24] We note that the theoretical existence of an FTCA remedy does not foreclose a remedy under *Bivens*.  *See Bistrian II*, 912 F.3d at 92 ("[I]t is 'crystal clear that Congress intended the FTCA and *Bivens* to serve as parallel and complementary sources of liability.'" (quoting *Malesko*, 534 U.S. at 68)).

[25] The Hyde Amendment allows courts to award attorney's fees and litigation costs to a prevailing criminal defendant under certain circumstances when "the position of the United

noted in *Farah*, "the [Supreme] Court has . . . made clear that even remedies that provide no compensation for victims and little deterrence for violators, such as injunctions and writs of habeas corpus, trigger the general rule that, 'when alternative methods of relief are available, a *Bivens* remedy usually is not.'"  *Farah*, 926 F.3d at 502 (quoting *Abbasi*, 137 S. Ct. at 1863); *see also Karkalas*, 2019 WL 3492232, at *10-11 (citing *Farah* and holding that "Congress . . . created a remedial structure and we should not upset the structure by implying a *Bivens* action here").[26]

### 6.   Qualified Immunity

Haugen argues that even if Xi's *Bivens* claims withstand the *Abbasi* analysis, they should be dismissed because he is entitled to qualified immunity.  Specifically, Haugen asserts that Xi's claims of malicious prosecution and unlawful search and seizure fail to state constitutional violations, much less violations of clearly established rights, because Haugen had probable cause to support the prosecution of Xi and the searches of his home and office.  With regard to Xi's Fifth Amendment claim, Haugen argues that Xi fails to plausibly allege any violation of his equal protection rights.

---

States was vexatious, frivolous, or in bad faith."  Pub. L. No. 105–119, § 617, 111 Stat. 2440, 2519 (1997) (codified at 18 U.S.C. § 3006A note (2016) (Award of Attorney's Fees and Litigation Expenses to Defense)).  Section 1495 of Title 28 provides a cause of action for damages "by any person unjustly convicted of an offense against the United States and imprisoned."  28 U.S.C. § 1495; *see also* 28 U.S.C. § 2513 (listing requirements for and capping damages available in suit under § 1495).  Section 2255 authorizes *habeas* relief for persons wrongly convicted and sentenced.  28 U.S.C. § 2255.

[26] *But see Bistrian II*, 912 F.3d at 92 (holding that availability of prison administrative grievance process and *habeas corpus* petition should not preclude *Bivens* action because those remedies cannot redress the alleged harm); *Marcavage v. Nat'l Park Serv.*, 777 F. Supp. 2d 858, 864 (E.D. Pa. 2011) (rejecting "the notion that the possibility of an award of attorneys' fees under the Hyde Amendment . . . precludes an action for constitutional injury under *Bivens*"), *aff'd*, 666 F.3d 856 (3d Cir. 2012).

"Qualified immunity shields government officials from personal liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *George v. Rehiel*, 738 F.3d 562, 571-72 (3d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The qualified immunity doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  "Qualified immunity is not merely a defense, but also 'an entitlement not to stand trial or face the other burdens of litigation.'"  *George*, 738 F.3d at 571 (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)).  "Thus, 'law enforcement officers acting within their professional capacity are generally immune from trial insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Vanderklok v. United States*, 774 F. App'x 73, 76 (3d Cir. 2019) ("*Vanderklok III*") (quoting *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000)).

"The Supreme Court has repeatedly 'stressed the importance of resolving [qualified] immunity questions at the earliest possible stage of the litigation.'"  *George*, 738 F.3d at 571 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).  Where a plaintiff fails to plead a violation of clearly established law, "a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery[,]" and a motion to dismiss under Rule 12(b)(6) on qualified immunity grounds is therefore procedurally proper.  *See Thomas v. Indep. Twp.*, 463 F.3d 285, 291-94 (3d Cir. 2006); *see also Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  When analyzing the qualified immunity defense at the pleadings stage, "we must accept plaintiff's

allegations as true and draw all inferences in plaintiff's favor." *George*, 738 F.3d at 581.

"However, 'a pleading that offers labels and conclusions or a formulaic recitation of the elements

of a cause of action will not do.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).  "Nor does a complaint

suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556

U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

      The Supreme Court initially set forth a mandatory two-part inquiry for determining

whether a government official was entitled to qualified immunity.  *Saucier*, 533 U.S. at 201.

Under *Saucier*, courts were required to first determine whether the facts alleged or shown were

sufficient to make out a violation of a constitutional or federal statutory right.  *Id.*  If the record

set forth or established no violation, no further inquiry was necessary.  *Id.*  On the other hand, if

the plaintiff sufficiently pled or established a violation, courts would then determine whether the

right at issue was clearly established at the time of the government official's alleged misconduct.

*Id.*  The Court receded from this mandatory sequence in *Pearson v. Callahan*, 555 U.S. 223, 236

(2009), and stated: "[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no

longer be regarded as mandatory," and judges "should be permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances in the particular case at hand."

               (a)    Xi Has Not Alleged a Violation of His
                         <u>Clearly Established Fourth Amendment Rights</u>

      Applying the foregoing standard to Xi's Fourth Amendment claims, Haugen's alleged

conduct did not violate Xi's clearly established Fourth Amendment rights.  In reaching that

conclusion, we recognize that, in general terms, individuals have a constitutional right not to be

subjected to the search and seizure of their persons or property except upon probable cause.  *See*

U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall

issue, but upon probable cause. . . .").   However, when analyzing the defense of qualified

immunity, we may not assess the alleged constitutional violation at a general level but, instead,

must "frame the precise contours of [the] right" the Plaintiff claims has been violated.   *Spady v.*

*Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015).   In *Spady*, the Third Circuit

provided the following guidance in regard to this task:

> We are mindful . . . that courts are "not to define clearly established law at a high
> level of generality."   [*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)] (citations
> omitted).   Instead, courts "must define the right allegedly violated at the appropriate
> level of specificity."   *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012).
> Accepting [a] broad version of the right at issue "would . . . convert the rule of
> qualified immunity that our cases plainly establish into a rule of virtually
> unqualified liability simply by alleging violation of extremely abstract rights."
> *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).   We are thus required to frame
> the right at issue "in a more particularized, and hence more relevant, sense,"
> *Anderson*, 483 U.S. at 640, "in light of the case's specific context, not as a broad
> general proposition," *Saucier*, 533 U.S. at 201.

*Id*.   A right is clearly established where there is applicable Supreme Court precedent, or, where

no Supreme Court case is directly on point, where "existing precedent [has] placed the statutory

or constitutional question '*beyond debate*.'"   *Id* at 639 (quoting *al-Kidd*, 563 U.S. at 741

(emphasis in original)).

In this case, Xi has failed to plausibly allege that the arguably deficient investigation and

prosecution violated his clearly established Fourth Amendment right not to be subjected to

search or seizure expect upon probable cause.   As a threshold matter, it is undisputed that Xi's

prosecution was based on a grand jury indictment, and that the subsequent searches and seizures

of his person and property in his home and office were effected pursuant to duly issued arrest

and search warrants.   "[A] grand jury indictment or presentment constitutes *prima facie* evidence

of probable cause to prosecute."   *Rose v. Bartle*, 871 F.2d 331, 353 (3d Cir. 1989); *see also*

*Karkalas*, 2019 WL 3492232, at *18 (noting that grand jury indictment constitutes *prima facie* evidence of probable cause (citation omitted)).  Similarly, "where the alleged Fourth Amendment violation involves a search and seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012); *see also Franks v. Delaware*, 438 U.S. 154, 171 (1978) (holding that affidavit of probable cause in support of a search warrant is entitled to a "presumption of validity").

The presumption that probable cause supported a grand jury indictment "will only be overcome 'by evidence that the presentment was procured by fraud, perjury or other corrupt means.'"  *Woodyard v. Cty. of Essex,* 514 F. App'x 177, 183 (3d Cir. 2013) (quoting *Rose*, 871 F.2d at 353)); *see also Karkalas*, 2019 WL 3492232, at *18 (noting that to overcome that presumption of probable cause attendant to a grand jury indictment, a plaintiff must present evidence of fraud, perjury, or other corrupt means (citations and internal quotation marks omitted)).  Likewise, to rebut the presumption that probable cause supported a duly issued arrest or search warrant, a plaintiff must prove that:  (1) the affiant "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant," and (2) "such statements or omissions are material, or necessary, to the finding of probable cause." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997). Moreover, an affiant's alleged negligence or innocent mistakes regarding the facts or evidence are insufficient to overcome the presumption of probable cause.  *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006) (citing *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir.2000)).

Therefore, among the essential elements of Xi's claims against Haugen, Plaintiffs must plausibly allege the absence of probable cause under the specific circumstances of this case.  *See*

*Pinkney v. Meadville*, No. 19-167, 2020 WL 1667241, at *6 (W.D. Pa. Apr. 3, 2020).  To

overcome the presumption of probable cause supporting the Indictment, arrest, and searches in

this case, Plaintiffs must provide more than conclusory allegations that Haugen provided false or

perjured information knowingly, with corrupt intent, or with reckless disregard for the truth.

"Probable cause 'is not a high bar.'"  *Pinkney*, 2020 WL 1667241, at *6 (noting that "[the

probable cause] standard 'does not require that officers correctly resolve conflicting evidence or

that their determinations of credibility were, in retrospect, accurate.'" (quoting *Dempsey v.

Bucknell Univ.*, 834 F.3d 457, 467-68 (3d Cir. 2016)); *see also Boudette*, 2019 WL 3931568, at

*10 ("Arguable probable cause exists if the officers' conclusions rest on an objectively

reasonable, even if mistaken, belief that probable cause exists. . . Accordingly, a defendant 'is

entitled to qualified immunity if a reasonable officer could have believed that probable cause

existed to arrest or detain the plaintiff.'" (quoting *Cortez v. McCauley*, 478 F.3d 1108, 1120(10th

Cir. 2007)).

Plaintiffs attempt to satisfy this burden by alleging that Haugen knew or recklessly

disregarded the innocent nature of Xi's communications with Chinese colleagues, which,

according to Plaintiffs, did not relate to the pocket heater technology at issue in the Indictment.

However, the SAC fundamentally relies on conclusory allegations—reprinted *supra*—regarding

what Haugen purportedly knew and understood about the highly technical field of thin film

superconducting science. (*See* SAC ¶ 55.); s*ee*, *e.g.*, *Karkalas*, 2019 WL 3492232, at *19 (noting

that a plaintiff cannot plead lack of probable cause with "bare conclusions); *Cobb v. Truong*, No.

13-1750, 2015 WL 1405438, at *10 (W.D. Pa. Mar. 26, 2015) (holding that "broad and

generalized labels and conclusions" are insufficient to rebut the presumptive probable cause

underlying grand jury indictment).  For example, Plaintiffs allege that at *an unspecified time*:

"Haugen was told by an inventor of the STI pocket heater that the diagrams of the SINAP

tubular heating device were not related to the STI pocket heater but, rather, the HPCVD process .

. . Xi invented"; Haugen "was informed that the STI pocket heater was not protected or

considered a trade secret"; "Haugen was in possession of . . . Xi's emails [and] the schematics

attached to those emails" and based on that possession, "Haugen knew or recklessly disregarded

the fact that . . . Xi never sent a photograph of the STI pocket heater to colleagues at Peking

University"; and "Haugen knew or recklessly disregarded the fact that . . . Xi never sent a

photograph of the STI pocket heater to colleagues at Tsinghua University and that his emails

with colleagues there involved a separate heater for the creation of oxide thin films."  (SAC ¶

55.)

      Plaintiffs do not dispute that Xi participated in the email exchanges that formed the basis

of the Indictment.  It is also undisputed that the emails underlying the Indictment and

investigation of Xi involved the highly complex field of super-conducting thin-film technology.

Therefore, the fundamental issue here is whether Plaintiffs have plausibly alleged that Haugen

and/or other government officials deliberately, intentionally, or recklessly misrepresented the

evidence in support of Xi's Indictment and the related searches and seizures, or whether they

simply erroneously concluded that the emails were connected to illegal conduct.  The allegations

of the SAC support only the latter.  Here, Plaintiffs' allegations do not support an inference that

Haugen knew of and misrepresented, recklessly disregarded, or ignored exculpatory evidence

*before* the case against Xi was presented to the grand jury or the searches and seizures at issue

were conducted.  *See*, *Pinkney*, 2020 WL 1667241, at *7, 10 (finding probable cause existed and

qualified immunity applied and noting that "once the evidence establishes probable cause, an

officer is not required to continue investigating, sifting and weighing information, nor is an

officer obligated to investigate the suspect's plausible claims of innocence"); *Meeks*, 611 F.
App'x 277, 283 ("It is not sufficient, even at the motion-to-dismiss stage, to make . . . vague and
conclusory assertions without factual support." (citing *Iqbal*, 546 U.S. at 678)).

Here, the SAC is devoid of any facts suggesting when or how Haugen knew or should
have known that the information in Xi's emails and attachments related not to the pocket heater,
but to other technologies.  *See Meeks v. Larson*, 611 F. App'x 277, 283 (5th Cir. 2015) ("[A]n
individual challenging a warrant affidavit must 'point out specifically the portion of the warrant
affidavit that is claimed to be false,' and this showing 'should be accompanied by a statement of
supporting reasons.'" (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).  The SAC
carefully avoids alleging that Haugen knew of the allegedly innocent nature of Xi's
communications with Chinese scientists during the course of the investigation, during the grand
jury proceedings, or when the related search and arrest warrants were issued.  Put simply, there is
no basis upon which to infer that Haugen intentionally or recklessly ignored exculpatory
evidence or misrepresented information in order to secure the Indictment and the related searches
and seizures.  *See Pinkney*, 2020 WL 1667241, at *10 ("[I]t cannot be said based upon the
allegations of the Amended Complaint that a reasonably well-trained officer would have known
that his affidavit failed to establish probable cause and that he therefor should not have applied
for the warrant.")

Even if we assume that, at some point, Haugen received conflicting information
regarding the content and nature of Xi's emails and attachments, that does not support a plausible
inference that Haugen made false, corrupt, knowing, or reckless representations to the grand
jury, prosecutors, or judicial officials, particularly where the information involved complex
technology and was potentially subject to dispute.  In this regard, we note that the information

resulting in the dismissal of Xi's criminal case apparently was not fully explained to the

government until after Xi's Indictment.  Specifically, in opposition to the instant Motions to

Dismiss, Plaintiffs' stated:

> Following his arrest, Professor Xi retained counsel who conducted a simple
> investigation of the facts underlying the charges against Professor Xi and easily
> obtained information confirming that the assertions in the Indictment were flatly
> false.  Professor Xi and his attorneys presented this information to prosecutors.
> Shortly thereafter, prosecutors moved to dismiss the Indictment.

(Pls.' Cons. Opp. 9 (internal citations to SAC omitted).)[27]

Plaintiffs' allegations support, at most, an inference that Haugen misunderstood the

technology involved, was mistaken in his assessment of the emails Xi exchanged with Chinese

colleagues, and arguably was negligent in failing to seek scientific evaluation of the evidence.

To the extent that Haugen, in fact, committed these errors, it cannot be denied that Xi and his

family have suffered greatly as a result.  However, mere negligence or mistake is not enough to

strip Haugen of qualified immunity.  *See Wilson*, 212 F.3d at 789 ("[N]egligence by public

---

[27] We also note that Plaintiffs' initial Complaint and FAC alleged that:
Haugen did not have a basic understanding of the science involved in Professor
Xi's research, let alone the expertise necessary to properly offer scientific opinions
and conclusions about Professor Xi's communications with colleagues in China.
Defendant Haugen failed to consult with qualified scientists who would have
informed him of his false scientific interpretations regarding Professor Xi's
communications with colleagues in China.
(*See* Compl. ¶ 41; FAC ¶ 51.)  We do not treat this allegation as a judicial admission, as it is well
established that "[a]plaintiff's 'amended complaint supersedes the original and renders it of no
legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading.'"
*Berkery v. Equifax Info. Servs. LLC*, No. 18-3417, 2019 WL 7042421, at *4 (E.D. Pa. Dec. 20,
2019) (quoting *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171
(3d Cir. 2013)).  However, "a party's assertion of contrary factual positions in the pleadings is
[not] without consequence. A superseded pleading may be offered as evidence rebutting a
subsequent contrary assertion."  *W. Run Student Hous. Assocs.*, 712 F.3d at 172-73.  Here, the
above-noted allegation is simply consistent with our conclusion that Haugen is entitled to
qualified immunity because his conduct alleged in the SAC plausibly suggests, at most,
negligence on Haugen's part.

officials is not actionable as a due process deprivation of a civil right."); *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir.1995) ("[T]he issue is not whether the information on which police officers base their request for an arrest warrant resulted from a professionally executed investigation; rather, the issue is whether that information would warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested."); *Craig v. Collins*, No. 13-1873, 2013 WL 5271521, at *5, n.30 (E.D. Pa. Sept. 17, 2013) (collecting cases and holding that attacks on thoroughness of investigation are "not premised on a constitutional violation, but rather on negligence").

Finally, Xi has not cited, nor has this Court found, any Supreme Court or other precedent establishing *beyond debate* that an individual in Xi's circumstance had a clearly established right to expert validation of the technical or scientific evidence that was the basis of a probable cause determination in an investigation or prosecution.[28]  *See Spady*, 800 F.3d at 638; *Muth v. Woodring*, 755 F. App'x 109, 113-14 (3d Cir. 2018) (noting that in qualified immunity analysis, courts must define the right asserted "in light of the specific situation the officer faced" (citing *Mullinex v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*))).

---

[28] In this case, the government did not charge Xi under the Economic Espionage Act of 1996, 18 U.S.C. §§ 1831 *et seq.*, which presumably would have entailed review and consultation with designated senior officials in the U.S. Department of Justice ("DOJ").  *See, e.g.*, U.S. Dep't of Justice, *Justice Manual* §§ 9-59-100, 9-59-110, available at https://www.justice.gov/jm/jm-9-59000-economic-espionage#9-59.100#9-59.100 (last accessed Mar. 31, 2021); *see also* Andrew Chongseh Kim, *Prosecuting Chinese "Spies": An Empirical Analysis of the Economic Espionage Act*, 40 Cardozo L. Rev. 749, 778 (2018) (stating that "it appears that some U.S. Attorneys may have intentionally *avoided* filing 'espionage' charges against some defendants in order to avoid internal DOJ regulations for handling espionage cases" (emphasis in original)); Matt Apuzzo, *After Missteps, U.S. Tightens Rules for Espionage Cases*, New York Times (Apr. 26, 2016), available at http://www.nytimes.com/2016/04/27/us/after-missteps-us-tightens-rules-for-national-security-cases.html (last accessed Mar. 31, 2021).

(b) <u>Xi Has Not Alleged a Violation of His Equal Protection Rights</u>

"The Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976).   Xi's Fifth Amendment claim alleges that Haugen pursued the investigation and prosecution of Xi "based on impermissible racial and ethnic factors, and specifically on [Xi's] Chinese ethnicity, his former status as a Chinese national, and the fact that his communications were with Chinese entities."  (SAC ¶ 102.)  In support of this claim, Xi offers the conclusory allegation that "[a]s a Special Agent . . .  working on Chinese counterintelligence, . . . Haugen's investigation of Professor Xi was predicated at least in part on the fact that Professor Xi is racially and ethnically Chinese, and was, . . . [formerly] a Chinese national."  (*Id.* ¶ 69.)

Plaintiffs' allegations are not supported by facts and are insufficient to state a plausible claim that Haugen violated Xi's Fifth Amendment rights.  In order to sustain a claim against Haugen for invidious discrimination, Xi must plead that Haugen acted with discriminatory purpose.  *Iqbal*, 556 U.S. 662, 676-77 ("[E]ach Government official . . .  is only liable for his or her own misconduct. In the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability . . .  for unconstitutional discrimination.").

As we noted in our *Bivens* analysis, *supra*, Xi does not allege that Haugen's investigation of Xi was motivated by any personal animus or bias against the Chinese.  Rather, Plaintiffs' allegations reveal that to the extent race and ethnicity were factors in the investigation and prosecution of Xi, those factors were the product of executive branch counterintelligence policy directed at countering economic espionage by China.  *See Abbasi*, 137 S.Ct. at 1860 ("A *Bivens*

54

claim is brought against the individual official for his or her own acts, not the acts of others.");
*George*, 738 F.3d at 572 ("[A] government official may only be held personally liable under
*Bivens* for his or her own misconduct." (citation and internal quotation marks omitted)).  Xi has
failed to plausibly allege that Haugen violated his Fifth Amendment rights and, accordingly,
Haugen is entitled to qualified immunity.

> **B.     The Discretionary Function Exception Deprives This Court of
>           Jurisdiction Over Plaintiffs' FTCA Claims Against the United States**

The FTCA waives the United States government's sovereign immunity for claims
sounding in state tort law for money damages.  28 U.S.C. § 2674 (waiving sovereign immunity
to make the Government liable "in the same manner and to the same extent as a private
individual under like circumstances").  District courts have jurisdiction over monetary claims
against the Government for the negligent or wrongful acts of its employees "where the United
States, if a private person, would be liable to the claimant in accordance with the law of the place
where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  Because state law, not federal
law, is "the source of substantive liability under the FTCA," constitutional tort claims against the
United States are not cognizable under the FTCA.  *F.D.I.C. v. Myers*, 510 U.S. 471, 477 (1994)

The FTCA waiver of immunity is subject to certain exceptions, including the
"discretionary function exception."  28 U.S.C. § 2680(a).  The discretionary function exception
withdraws the United States' consent to be sued for the allegedly negligent or wrongful acts of
its employees where the plaintiff bases the claim "upon the exercise or performance or the failure
to exercise or perform a discretionary function or duty on the part of a federal agency or an
employee of the Government, *whether or not the discretion involved be abused*."  28 U.S.C. §
2680(a) (emphasis added).  "Congress enacted the [discretionary function exception] to 'prevent
judicial second-guessing of legislative and administrative decisions grounded in social,

economic, and political policy through the medium of an action in tort.'"  *Baer v. United States*, 722 F.3d 168, 172 (3d Cir. 2013) (quoting *United States v. Varig Airlines*, 467 U.S. 797, 808 (1984)).  Plaintiffs "bear the burden of demonstrating that their claims fall within the scope of the FTCA's waiver of government immunity."  *Id.* at 172.  In turn, the government bears the burden of proving the applicability of the discretionary function exception, including the necessary jurisdictional facts.  *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 344-45 (3d. Cir. 2012).  Claims that fall within the discretionary function exception must be dismissed for lack of subject matter jurisdiction.  *See Berkovitz v. United States*, 486 U.S. 531, 533 (1988).

Courts use a two-step test to determine the applicability of the discretionary function exception.  *See United States v. Gaubert*, 499 U.S. 315, 322-23, (1991).  First, courts determine whether the conduct "involves an element of judgment or choice."  *Berkovitz*, 486 U.S. at 536; *see also Barbieri v. United States*, No. 16-3748, 2017 WL 4310255, at *4 (E.D. Pa. Sept. 28, 2017) (citing *Gaubert*, 499 U.S. at 322)).  The challenged conduct does not satisfy this prong if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536.

Second, if the conduct involves an element of judgment or choice, courts then must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield."  *Berkovitz*, 486 U.S. at 536; *see also Karkalas*, 2019 WL 3492232, at *21 ("Investigative activity is 'precisely the kind of policy-rooted decisionmaking that section 2680(a) was designed to safeguard.'" (quoting *Kelly v. United States*, 924 F.2d 355, 362 (1st Cir. 1991)).  The discretionary function exception immunizes the United States from suit if the decision was susceptible to public policy considerations.  *Berkovitz*, 486 U.S. at 537-39.

Whether the discretionary function exception is implicated depends on the nature of the conduct, not the status of the actor.  *Varig Airlines*, 467 U.S. at 813.  When a complaint solely addresses "the quality of the investigation as judged by its outcome, the discretionary function [exception] should, and . . . does apply," as "Congress did not intend to provide for judicial review of the quality of investigative efforts."  *Pooler v. United States*, 787 F.2d 868, 871 (3d Cir. 1986), *abrogated on other grounds by Millbrook v. United States*, 569 U.S. 50, (2013); *see also Baer*, 722 F.3d at 175 ("Whether to pursue a lead, to request a document, or to assign additional [personnel] to an investigation are all discretionary decisions, which necessarily involve considerations of, among other things, resource allocation and opportunity costs."); *Karkalas*, 2019 WL 3492232, at *22 ("Investigative decisions and decisions to prosecute fall within the discretionary function exception."); *Barbieri*, 2017 WL 4310255, at *6 ("[A]n FBI agent's investigatory decisions and a decision to prosecute are determinations that are policy-based in nature, . . .  [and are] the type that the discretionary function exception was designed to shield." (citing *Kelly v. United States*, 924 F.2d 355, 362 (1st Cir. 1991)).

In this case, all of Plaintiffs' FTCA claims are premised on the judgments and decisions made by Haugen and other government officials regarding whether and how to investigate and prosecute Xi.  These judgments and decisions fall squarely within the discretionary function exception, which deprives us of subject matter jurisdiction.  We have analyzed Plaintiffs' allegations at length above and have also concluded that Haugen's conduct did not violate Xi's clearly established constitutional rights.  These conclusions are fatal to Plaintiffs' claims under the FTCA.[29]  We lack jurisdiction to adjudicate Plaintiffs' FTCA claims, we do not address

---

[29] We acknowledge the authority holding that "conduct cannot be discretionary if it violates the Constitution, a statute, or an applicable regulation" because "[f]ederal officials do not possess discretion to violate constitutional rights or federal statutes."  *See U.S. Fid. & Guar.*

whether under Rule 12(b)(6) those claims would otherwise state plausible causes of action under Pennsylvania law.

## V.     CONCLUSION

What happened to Xi and his family is very unfortunate.  Nevertheless, it is the obligation of this Court to simply apply the law as it presently exists to the facts.  In doing that, for the reasons outlined above, we are compelled to conclude that the motions must be granted.

An appropriate order follows.

BY THE COURT:


*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**

---

Co. v. United States, 837 F.2d 116, 120 (3d Cir. 1988) (citations omitted), *cert. denied*, 487 U.S. 1235 (1988); *see also Pooler*, 787 F.2d at 871 (stating that federal officials do not have discretion to violated constitutional rights or federal statutes); *Fazaga v. Fed. Bureau of Investigation,* 916 F.3d 1202, 1251 (9th Cir. 2019) (noting that discretionary function exception does not apply to conduct that violates a non-discretionary legal mandate).  However, since we have determined that Haugen did not violate Xi's clearly established constitutional rights, it is unnecessary to address this authority further.